ALSTORES REALTY CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4928–62. Filed June 15, 1966.

*Thomas A. Frazier, Jr.,* for the petitioner.
*Charles M. Greenspan,* for the respondent.

HOYT, *Judge:* Respondent determined a deficiency in income tax against petitioner in the amount of $120,429.60 for petitioner's taxable year ended January 31, 1958. Respondent's disallowance of a portion of petitioner's claimed deduction for accrued taxes has not been challenged. Hence, the only issues remaining for decision are: (1) Whether petitioner realized $253,090.75 of rent income as a result of a transaction in which it purchased a warehouse property for $750,000 cash plus a simultaneous agreement to permit the seller to retain occupancy of a portion of the building rent free for 2½ years, and (2) if petitioner did realize rent income as determined by respondent, is it entitled to increase its cost basis in the property by the amount so realized, and accordingly increase its annual depreciation of the building?

### FINDINGS OF FACT

Petitioner, Alstores Realty Corp., is a corporation organized in 1947 under the laws of the State of Delaware to engage in various aspects of the real estate business. Petitioner maintains its books and records and files its Federal income tax returns on the accrual basis of accounting and on a fiscal year ended January 31 of each year. It timely filed its Federal income tax return for the fiscal year ended January 31, 1958, with the district director of internal revenue for the Manhattan District of New York. Since its organization, petitioner has been a wholly owned subsidiary of Allied Stores Corp., a Delaware corporation, engaged in the ownership and operation directly and through subsidiaries of a large number of retail department stores in at least 18 States. Allied Stores Corp. is a publicly held corporation whose stock is listed on the New York Stock Exchange.

Stern Brothers, Inc. (hereinafter sometimes referred to as Stern Bros.), now a part of another wholly owned subsidiary of Allied Stores Corp., was at the time of the transaction here in question 98-percent owned by Allied Stores Corp. Stern Bros. operated a retail department store on 42nd Street in New York City. Under the charter of Allied Stores Corp., the subsidiary corporations which operate retail department stores are subject to a restriction which

prevents them from financing purchase of real estate. Stern Bros. was subject to this restriction. Alstores Realty Corp. was a nonrestricted subsidiary and, in fact, was organized for the purpose of acquiring and financing purchases of real property to be used by restricted subsidiaries.

Steinway & Sons, a New York corporation (hereinafter sometimes referred to as Steinway), was, prior to February 1, 1957, owner of certain real property at 45–02 Ditmars Boulevard, Queens, N.Y. (hereinafter sometimes referred to as the subject property), part of which it leased to tenants and part of which it used in its own manufacturing operations. The subject property at the time of the transaction in question consisted of land measuring 200 by 525 feet or a total of 105,000 square feet on which was located a warehouse building containing five stories plus a basement. The building was approximately 50 years old and it was H-shaped, containing approximately 275,926 square feet of usable area. Prior to the transaction here in question, portions of this building were leased by Steinway to Stern Bros.; as of October 4, 1956, Stern Bros. had a total of 59,178 square feet under lease at a rental of approximately 75 cents per square foot per annum (6¼ cents per square foot per month). Steinway also leased approximately 500 square feet to Nathan Manufacturing Co., which was not related to any of the corporations here involved, at a rate of about 78 cents per square foot per annum.

During the period 1956 through the middle of 1959, Steinway & Sons was in process of consolidating its manufacturing and other facilities at another location, and it decided to sell the subject Ditmars Boulevard property. However, the new facilities were not ready for complete occupancy by Steinway & Sons until sometime in 1959, and until such time as the new facilities were ready for occupancy, Steinway & Sons required the continued use of considerable space in the subject property.

In 1956 and 1957, Stern Bros. was in process of building a new store in Bergen Mall Shopping Center in Paramus, N.J. In anticipation of the opening of this store on November 1, 1957, Stern Bros., Alstores Realty Corp., and Allied Stores Corp. began consideration of methods of acquiring additional warehouse space in order to handle the merchandise that would be needed for sale in the Paramus store.

Preliminary negotiations were entered into in the spring of 1956 looking toward a possible sale of the subject property by Steinway & Sons to petitioner for use by Stern Bros. The customary procedure for purchases by petitioner of real estate for use of a restricted subsidiary was that preliminary negotiations be conducted by the manager of the subsidiary which would use the property. Such preliminary negotiations were carried on in the case of the subject property between

the then president of Stern Bros. and a New York real estate broker-age firm representing Steinway & Sons.

Steinway's original asking price for the subject premises was $1,250,-000; this was later lowered to $1 million. However, because Steinway at the time of these negotiations was not yet prepared to remove its manufacturing operations from the subject building, it would not at that time have agreed to a sale unless an arrangement could be made permitting it to retain possession of a portion of the building until its new plant would be ready for occupancy. Eventually, in 1956, the parties agreed to a transaction under which petitioner (Alstores) would pay $750,000 cash for title to the building and Steinway would retain occupancy of a portion of the building for 2½ years from the date of conveyance, without further payment of rent.

After this arrangement had been agreed upon, Steinway's attorney prepared a single written document to effectuate the contract. This document provided for sale of the subject premises with a contemporaneous lease of portions of the premises by the purchaser back to Steinway. The petitioner's attorney, however, requested that the single contract be split into two separate contracts.

On October 4, 1956, two agreements were executed by petitioner and Steinway & Sons with respect to the subject property. The first agreement can, for convenience, be called the sale contract and the second agreement can, for convenience, be called the space occupancy agreement. The two agreements were executed and delivered by the parties simultaneously and were expressly made interdependent one upon the other. Steinway & Sons would not have entered into the sale contract without also entering into the space occupancy agreement, and vice versa. The two agreements constituted the sole and entire agreement between petitioner and Steinway & Sons with respect to the transaction in question and with respect to the subject property. At the time the sale contract and the space occupancy contracts were executed and delivered, petitioner paid Steinway & Sons the amount of $75,000.

The space occupancy agreement contains, *inter alia*, the following provisions:

WHEREAS, the parties hereto are about to enter into a contract for the sale by Steinway to Alstores of certain premises known as and by the street number 45–02 Ditmars Boulevard, Borough of Queens, City and State of New York, and

WHEREAS, an essential element of the consideration to induce Steinway to enter into said contract of sale is the execution of this agreement by Alstores.

Now, THEREFORE, in consideration of the premises and of the mutual promises and covenants hereinafter contained, it is hereby agreed as follows:

1. Alstores as Landlord, agrees to provide Steinway as Tenant, *without further payment* by Steinway therefor, with space, services and facilities in the premises

to be conveyed under the aforesaid contract of sale, all as more fully set forth in the following schedule and paragraphs:

| Space to be occupied by seller | Area in square ft. | Term of occupancy from closing of title |
|---|---|---|
| [Various locations are here described broken down as to floors.] | [Total on all floors but third=131,952.] | Two and one-half years. |
| Entire third floor_____ | 45,446_____ | Two months. |

2. In addition to the space outlined above, Alstores, as Landlord, shall provide Steinway, as Tenant, with free and undisturbed access, jointly with Alstores, to all of the common facilities of the building, including but not limited to all truck bays, driveways, elevators and that portion of the second floor where the time clocks are presently located. In addition, Alstores, as Landlord, shall provide Steinway, as Tenant, during the term set forth above, without additional charge therefor, with heat, electricity and water in the same manner and to the same extent as Steinway, as Landlord, has heretofore provided such services to Alstores' affiliate, Stern Brothers, as Tenant. Alstores further agrees that any alteration or construction work which it or its said affiliate may undertake shall not, during the term above set forth, unduly interfere with Steinway's use of the space set forth above and/or Steinway's production facilities.

3. It is understood and agreed that if any portion of the space to be used and occupied by Steinway as hereinabove provided for shall, during the term set forth above, be so damaged or destroyed by fire or other cause as to render same unusable by Steinway in its business operations or if Alstores shall be unable or unwilling to provide Steinway with the quiet enjoyment thereof, whether such failure shall result from Act of God, action of any governmental authority or action or neglect on the part of Alstores, its successors or assigns, or if for any reason whatsoever, other than Steinway's acts, Steinway's use and occupancy of such space or any part thereof is destroyed or substantially impaired, Alstores shall, during any such period, pay to Steinway, on the 1st day of each and every month, during the balance of the term above set forth, a sum equivalent to six and one-quarter (6¼) cents per square foot for that portion of the space so affected.

4. Steinway, as Tenant, shall have the right, from time to time, to terminate the tenancy, or any part thereof, as of the expiration of two years from closing of title under the aforesaid contract of sale, or any time thereafter during the term, in each instance upon not less than sixty (60) days prior written notice to that effect, in which event, Alstores shall pay to Steinway on the 1st day of each and every month during the balance of the term, a sum equivalent to six and one-quarter (6¼) cents per square foot for that portion or portions of the space as to which Steinway's tenancy has been so terminated, provided however, that Steinway's right to terminate as hereinabove set forth shall not apply to units of space less than a wing of a floor.

\* \* \* \* \* \* \*

6. Except as hereinabove otherwise expressly provided, all of the terms and conditions of the Standard Form of Loft Lease of the Real Estate Board of New York, Inc., shall apply and extend to Steinway's tenancy during the term thereof.

[Emphasis supplied.]

Pursuant to the sale contract and the space occupancy agreement, closing of the transaction took place on February 1, 1957. At the closing, petitioner paid $675,000 to Steinway, which with the $75,000 paid

on October 4, 1956, completed the cash consideration of $750,000 specified in the sale contract. Steinway delivered a bargain and sale deed to petitioner pursuant to paragraph 7 of the sale contract, which deed was recorded in due course. Prior to delivery of the deed to petitioner, Steinway's attorney affixed to the deed revenue stamps in the amount of $1,103.85, reflecting a consideration for the transaction of $1,003,090.75. The difference between $1,003,090.75 and the $750,000 total cash consideration, or $253,090.75, was the fair rental value of the space in the subject premises which Steinway was to occupy "without further payment," pursuant to the above-described occupancy agreement, measured at a rate of 6¼ cents per square foot per month. This was the same rate then being paid to Steinway by Stern Bros. under existing lease for portions of the subject property.

In connection with petitioner's application for a mortgage loan on the subject property, an officer of petitioner informed the prospective bank mortgage holder that the dollar consideration for the purchase would not reflect petitioner's entire cost. This occurred about 1 month prior to the execution of the purchase contract and space occupancy agreement.

Following the closing on February 1, 1957, between petitioner and Steinway & Sons, petitioner on the same day, February 1, 1957, entered into a net lease of its interest in the subject property to Stern Bros. On the closing date, the secretary of petitioner corporation executed an affidavit stating that the subject property was subject "to leases to Stern Brothers and Steinway & Sons, which cover the entire premises." Stern Bros. in said net lease agreement took "subject to" the space-occupancy agreement with Steinway, a copy of which was attached to the lease. Stern Bros. did not assume the obligations of petitioner thereunder. Stern Bros. entered upon occupancy of the portions of the subject property thus leased from petitioner. Steinway & Sons continued in possession of certain areas specified in the 1956 space-occupancy agreement, and adjustments were made as to space allocations between Steinway and Stern Bros. on the second floor.

Beginning in early 1958 and from time to time thereafter Steinway, by agreement with Stern Bros., vacated portions of the space in the subject property which it had been occupying and received payment from Stern Bros. at a rate of 6¼ cents per square foot per month for the space so vacated. From February 1958 through July 1959, Stern Bros. paid a total of $89,446.36 to Steinway for space vacated by Steinway. On Stern Bros.' books the payments to Steinway are shown as "rent expense" and the payments were deducted by Stern Bros. in consolidated Federal income tax returns filed for the applicable periods.

After consummation of the transaction here in question, Steinway, which kept its books and records and filed its tax returns on an accrual

basis, made an entry in its general ledger showing prepaid rent as of February 1, 1957, in the amount of $253,090.75. This entry was based upon Steinway's rights of occupancy under the above-described space occupancy agreement. The amount was arrived at by multiplying the number of square feet involved by the number of months by 6¼ cents per month. Over a period of 30 months subsequent to February 1, 1957, Steinway deducted a total of $163,644.39 as rent in its Federal income tax returns, this sum representing the difference between the prepaid rent item of $253,090.75 and the $89,446.36 which Steinway received as aforesaid from Stern Bros. in connection with Steinway's vacating portions of the space covered by its lease with petitioner. No cash rental payments were ever made by Steinway to petitioner.

Respondent determined in the deficiency notice that petitioner realized $253,090.75 additional taxable income from rents from Steinway & Sons in its 1958 fiscal year which was not reported in its income tax return for that year. Petitioner assigns error to that determination and in its petition alleges alternatively that if this determination should be sustained, petitioner's cost basis for the property (purchase price) should be increased by this amount to $1,003,090.75 and additional depreciation allowed.

In its books of account, petitioner recorded in April 1957, $167,647 as cost of land and $582,353 as cost of buildings. In its tax return for the taxable year in question, petitioner showed $582,353 as original cost of the building acquired from Steinway, and depreciation was computed on this amount as cost basis. Petitioner regarded the cost of the entire parcel (both land and building) acquired from Steinway to be $750,000 (the total cash paid). This total was allocated between land and building according to the ratio of valuations assessed for real estate tax purposes by the City of New York, $95,000 for the land and $355,000 for the buildings. Petitioner assigned to the building a 30-year useful life with no salvage value. The respondent has not challenged petitioner's computation of depreciation as claimed in its return, however, he has made no adjustment in the notice of deficiency increasing cost basis and allowable depreciation as a result of his determination that petitioner realized rental income.

The parties have stipulated certain facts, some of which are detailed above. The stipulated facts are adopted as our findings and incorporated herein by this reference.

#### ULTIMATE FINDINGS OF FACT

The fair market value as of February 1, 1957, of Steinway's rights of occupancy under the space-occupancy agreement was $253,090.75. The fair market value of the subject premises on February 1, 1957, was $1,003,090.75, and petitioner's cost basis in the property was $1,003,090.75, the total purchase price paid when the cash considera-

tion of $750,000 is added to the fair market value of the leaseback to Steinway. Petitioner received rental income of $253,090.75 on February 1, 1957, when the transaction was closed and the subject property was deeded to it by Steinway & Sons.

OPINION

It is respondent's contention that petitioner realized taxable rent income as a result of the transaction described in our findings. Petitioner contends simply that Steinway's occupancy was expressly made rent free and that petitioner never received any rent payments from Steinway for occupancy of the subject premises in the taxable year in question or any other year.

Steinway & Sons reported the transaction as a sale on which the "amount realized" within the meaning of section 1001(b)[1] was not only the $750,000 cash received, but also included the fair market value of the rent-free space-occupancy agreement; said fair market value was determined to be $253,090.75. This amount was "capitalized" on the books of Steinway and amortized (with adjustments for payments from Stern Bros. as detailed above) over the 2½-year term of the space-occupancy agreement.

The Commissioner has also challenged this treatment of the subject transaction on the part of Steinway by disallowing Steinway's claimed rent expense deductions resulting from its writeoff of the capitalized fair value of the 2½-year space-occupancy agreement. Steinway is contesting this determination in two separate cases in this Court—docket No. 91397, involving the years 1957 and 1958 and docket No. 1952–63, involving the year 1959. The Commissioner has taken a protective position between the two parties, arguing that the petitioner herein, Alstores, received $253,090.75 rent income from its transaction with Steinway, and arguing in the Steinway cases (which were not consolidated with the instant case) that Steinway incurred no deductible rent expense as a result of the transaction.

There are two approaches to analyzing the transaction here involved. One approach is to say that there was a purchase by petitioner of the entire fee interest in the subject premises and at the same time a lease of a portion of the premises back to the seller for a 2½-year term. This is the approach taken by the respondent herein.

Petitioner contends that even if the space-occupancy agreement should be regarded as a lease, there was, nonetheless, no income produced to the "lessor" since the "lease" was rent free. While it may be true that no rent was due or to be paid after Steinway's occupancy was to begin as petitioner's tenant, the agreement of the parties

---

[1] All statutory references are to the Internal Revenue Code of 1954.

recognizes that it was because prepayment had been made by Steinway. As disclosed by our findings the contract itself speaks in terms of "further payment," an obvious recognition by the parties at that time that payment had already been made. The answer to petitioner's contention here is that although there were no cash payments to petitioner designated as rent after the property was deeded to it, Steinway's right of occupancy thereafter was a valuable one for which petitioner must have received consideration in some form, and that consideration was in the form of Steinway's conveyance to petitioner of fee title to the entire building—to the extent that the purchase price of the building exceeded the $750,000 cash paid therefor, or $253,090.75, as determined by respondent. This approach to a similar transaction was taken in *Famous Foods, Inc.* v. *United States*, 215 F. Supp. 206 (W.D.Pa. 1963).

The alternative analysis of the situation looks to the substance of the transaction. Petitioner here argues that, although in form there may have been a sale and leaseback, in substance there was a conveyance of a *future interest* with Steinway reserving to itself, or carving out, a term of 2½ years in a portion of the property. Hence, Steinway in substance retained its right to occupancy not as a lessee of petitioner, but as a legal owner of a reserved term for years. This approach is supported by *Kruesel* v. *United States*, an unreported case (D.Minn. 1963, 12 A.F.T.R. 2d 5701, 63–2 U.S.T.C. par. 9714).

Although at first blush petitioner's argument is an appealing one, we conclude that it must be rejected and we must hold for respondent. Steinway did not in form or substance reserve an estate for years.

An analogous situation was presented in *McCulley Ashlock*, 18 T.C. 405 (1952). There the building in question was subject to a lease to a third party at the time it was purchased by the taxpayer. The contract of sale provided that the buyer would pay $40,000 cash but the seller was to retain "possession" of the premises and all the rights to the rental income from the lessee until the expiration of the primary term of the existing lease (about 28 months from date of the sale contract). The Commissioner determined that the rent received by the seller subsequent to conveyance of title to the taxpayer purchaser was really taxable income to the taxpayer purchaser. We rejected the Commissioner's approach in that case, holding that the seller had reserved an ownership interest in the property (an estate for years) and that the rents received were income to the seller for occupancy of what was still his property—not income to the purchaser, who did not then have a present legal ownership interest but only a future interest. The essence of our reasoning in the *Ashlock* case was as follows (pp. 411–412).

Here, the trustees [the sellers of the property] not only retained the rents legally but they also retained control and benefits of ownership. Under the contract of sale on April 18, 1945, the trustees specifically agreed to pay property taxes, insurance premiums, and "all normal maintenance items and expenses," so that the property would be delivered to * * * [the buyer] in the present condition except for normal wear and tear. Futhermore, the June 11, 1945, agreement stated that in the event that the property was damaged or destroyed, and loss of income during the period of repair or reconstruction would be the trustees' loss. It further provided that insurance proceeds would be devoted to restore and repair the property, except in the event of total destruction petitioner would have the option of rebuilding the premises or compensating the trustees for unpaid rent. Thus the trustee bore the risks of ownership of the rents and managed the property. Larger expenses or a cessation of rents were risks incurred by the trustees. * * *

A directly analogous problem, solved by the same type of reasoning may be found in the "oil payment" line of cases in which the question is whether or not the vendor of an oil lease retains an economic interest in the oil in place. See *Thomas* v. *Perkins*, 301 U.S. 655 (1937).

The same factors which we looked to in *Ashlock* in deciding in favor of the purchaser, analyzed in the factual posture of the instant case, dictate the opposite result here. Petitioner, the buyer, assumed control of the premises and the benefits of ownership. Petitioner, the buyer, specifically agreed to pay for and supply to Steinway, the seller, heat, electricity, and water. The space-occupancy agreement stated that in the event the property was damaged or destroyed and Steinway's occupancy was thereby destroyed or impaired the burden of loss would be upon *petitioner* (with petitioner agreeing to pay Steinway 6¼ cents per square foot per month for space so affected). It is clear in the instant case that the buyer bore the risks and burdens of ownership during the term of the space-occupancy agreement. Such was not the case in *McCulley Ashlock, supra,* nor apparently in *Kruesel* v. *United States, supra,* relied upon by petitioner.

Furthermore, the rights of Steinway, the seller, as occupant were not those of a holder of a legal estate for years but were specifically limited to those of a lessee. The standard terms and conditions of a New York Real Estate Board form lease were imposed. For example, Steinway could not alter or improve the building nor sublet or assign its interest without the consent of petitioner.

Of key significance in this case is the fact that petitioner was required to pay to Steinway 6¼ cents per square foot per month for space which Steinway was entitled to occupy but which it may have been unable to occupy by reason of an act of God or the fault of petitioner, or which it may have elected to vacate during the last one-half year of the space occupancy agreement. This arrangement is entirely inconsistent with the theory that Steinway had a reserved estate for years; why would petitioner, the alleged remainderman, be required to make payments to Steinway, the alleged owner of an estate

for years, as a result of nonoccupancy by the latter? What we really have here is a provision for reimbursement of prepaid rent in the event the tenant is denied (or, during the last one-half year of the term, elects abandonment of) its right of unfettered occupancy, the prepaid rent being in the form of the value of the property received by petitioner in excess of the $750,000 cash paid therefor.

Petitioner emphasizes the fact that it received no cash rental payments at any time; it merely purchased real estate for cash. This is partly true, but one need not receive cash to have received income. In *Pembroke* v. *Helvering*, 70 F. 2d 850 (C.A.D.C. 1934), affirming 23 B.T.A. 1176 (1931), the taxpayer was held to have received rent income in the amount of the value of the equity in certain property received in partial consideration for granting a long-term leasehold on other property owned by the taxpayer. In the instant case petitioner received, in exchange for the lease interest granted to Steinway, rent income in the amount of the excess of the value of the property that petitioner received over the cash which it paid.

Rather than to rely on its argument that it received no cash payments labeled as rent, petitioner might have attempted to show that it did not receive on the purchase any value in excess of the cash consideration paid so that it received nothing which could be considered rent, even constructively. However, such a showing has not been made and we have found as an ultimate fact that the property had a fair market value of $1,003,090.75 at the time of transfer.

The president of Steinway testified for respondent that his original asking price for the property was $1,250,000, and later $1 million, and that he agreed to accept $750,000 cash only with the concomitant rent-free space-occupancy agreement, which the evidence indicates had a fair market value of $253,090.75. The parties were both intimately familiar with the property and were dealing at arm's length, and in the absence of evidence to the contrary, it must be concluded that the value of the property conveyed to petitioner was equal to the value of what was received by Steinway as consideration, $1,003,090.75. Petitioner, on whom rests the burden of proof, made no attempt at trial to establish the fair market value of the property.

Possibly the result in the instant case would be different if the parties had in fact *intended* to carve out a reserved term for years in Steinway and had structured their transaction in that form. See *Kruesel* v. *United States*, *supra*. We do not agree with petitioner, however, that to hold that there was a sale of the fee and a simultaneous leaseback here is to exalt form over substance. The so-called space-occupancy agreement placed the two parties' rights, obligations, and risks as they would be allocated in a typical lease arrangement. Hence, the arrangement was a lease in substance as well as in form.

Petitioner's arguments in the instant case have been directed almost exclusively at the question whether or not there was a lease which gave rise to rent income. Petitioner has not effectively challenged respondent's determination of the *amount* of the rent income. Since we have held that a lease did exist in substance and in form, we sustain respondent's determination that petitioner received taxable rent income in the taxable year in question in the amount of $253,090.75.[2]

Petitioner has raised the alternative argument that if it is deemed to have received rent income upon purchase of the subject premises its cost basis of said premises should be increased by the amount of such income and, consequently, its annual depreciation deduction increased. Petitioner originally treated the entire premises as having a basis of $750,000, the amount of cash paid, and it had taken depreciation on the portion of that amount allocable to the depreciable building. Respondent objects to any increase in petitioner's basis as a result of a determination that petitioner realized rent income, however, he presents no argument on this point.

Respondent's position is entirely inconsistent with the theory upon which his principal argument is grounded. We have held above, sustaining respondent, that petitioner acquired a parcel of improved real estate for which it paid not only $750,000 cash, but the grant of a 2½-year lease on a portion of the premises. The fair market value of this lease was $253,090.75, which amount is as much a cost of acquiring the property as the cash consideration. Sec. 1.1012–1, Income Tax Regs. Cf. *Larkin* v. *United States*, 78 F. 2d 951 (C.A. 8, 1935) ; T.D. 3435, II–1 C.B. 50 (1923).

We hold that petitioner's cost basis in the subject premises includes the $253,090.75 fair market value of the space-occupancy agreement. This sum must be allocated between the land and the building in the same proportions as the $750,000 cash consideration was allocated. The correct deduction for depreciation for the taxable year here involved, after giving effect to this holding, may be determined under Rule 50.

Petitioner's net operating loss deduction as limited by section 381 (c) (1) (B) may be recomputed under Rule 50, giving effect to the net increase in income resulting from our holdings herein.

*Decision will be entered under Rule 50.*

---

[2] This amount represents the fair market value of the occupancy rights of Steinway under the space-occupancy agreement. It also represents the amount by which the fair market value of the subject premises on the date of transfer exceeded the $750,000 cash paid by petitioner.