STEINWAY & SONS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 91397, 1952–63.   Filed June 20, 1966.

*Edward R. Peckerman, Jr.,* and *Norman M. Sheresky,* for the petitioner.

*Charles M. Greenspan,* for the respondent.

HOYT, *Judge:* Respondent determined the following deficiencies in petitioner's Federal corporate income tax:

| Docket No. | Taxable year | Deficiency |
| --- | --- | --- |
| 91397 | 1957 | $9,911.82 |
| 91397 | 1958 | 41,357.63 |
| 1952–63 | 1959 | 27,250.60 |

The two cases were consolidated for briefing and opinion upon joint motion of the parties.   All other adjustments raised in the notices of deficiency having been unchallenged by petitioner or settled by stipulation, the only issue for our decision herein is whether respondent erred in disallowing certain claimed deductions for "rent expense" in each of the years in question.

### FINDINGS OF FACT

Some of the facts have been stipulated; the written stipulation of facts is incorporated herein by this reference.

Petitioner (sometimes hereinafter referred to as Steinway) is a New York corporation with its principal office at Long Island City, N.Y. It filed its Federal corporate income tax returns for each of the years in question with the district director of internal revenue in Brooklyn, N.Y.

In 1950 petitioner owned three factories in Long Island City, namely, its Riker Avenue plant, one plant at 34–02 Ditmars Boulevard, and another plant at 45–02 Ditmars Boulevard (the subject premises). Petitioner, as a matter of corporate policy, had adopted a consolidation program whereby all of its production facilities were to be consolidated in the Riker Avenue plant.   This policy was to be carried

out in stages over a period of years and required the eventual erection of new facilities at Riker Avenue, vacating the two plants on Ditmars Boulevard, and ultimately the sale of the two Ditmars Boulevard plants. In pursuance of the aforesaid policy, petitioner, in 1951, sold the plant at 34-02 Ditmars Boulevard to Alstores Realty Corp. for use by Stern Brothers (hereinafter sometimes referred to as Stern Bros.).

Alstores Realty Corp. (hereinafter sometimes referred to as Alstores) is a wholly owned subsidiary of Allied Stores Corp. (hereinafter sometimes referred to as Allied) and is the principal real estate company of Allied. Allied is the holding company of a chain of department stores known as the Allied Group. Stern Bros. is a department store, a member of the Allied chain and a wholly owned subsidiary of Allied.

In the spring of 1956, the subject premises were occupied in part by petitioner and were leased in part to Stern Bros. and in part to Nathan Manufacturing Co. The rental paid by Stern Bros. was approximately 75 cents per square foot per annum. The rental paid by Nathan Manufacturing Co. was approximately 78 cents per square foot per annum.

In the spring of 1956, the broker who had brought about the 1951 sale of the first Ditmars Boulevard building initiated with petitioner negotiations for the sale of the subject premises to Alstores for use by Stern Bros. Petitioner indicated an interest in selling but added that it would require continued occupancy of a portion of the building until completion of new space at its Riker Avenue location. Petitioner's president quoted the broker a price of $1,250,000. When told somewhat later that this price was too high, petitioner lowered its offering price to $1 million, indicating that this was a rock bottom figure. Subsequently, the broker introduced the idea of consummating the transaction partly for cash and partly for a right in Steinway to a period of occupancy rent free. Steinway was willing to accept such an arrangement.

On October 4, 1956, two agreements were executed simultaneously by petitioner and Alstores with respect to the subject premises. One agreement, which can for convenience be called the sale contract, provided for the conveyance of the subject premises by Steinway to Alstores for $750,000 cash. The other agreement, referred to for convenience as the space-occupancy agreement, provided that Steinway would occupy a specified portion of the building for a period of $2\frac{1}{2}$ years [1] from date of conveyance, "without further payment" of rent. These two agreements were expressly made interdependent one upon the other. Steinway & Sons would not have entered into the sale

---

[1] In addition to the space provided for $2\frac{1}{2}$ years on several floors Steinway was also given occupancy of the third floor for 2 months.

contract without also entering into the space-occupancy agreement, and vice versa.

The space-occupancy agreement contains, *inter alia*, the following recitals and provisions:

WHEREAS, the parties hereto are about to enter into a contract for the sale by Steinway to Alstores of certain premises known as and by the street number 45–02 Ditmars Boulevard, Borough of Queens, City and State of New York, and

WHEREAS, an essential element of the consideration to induce Steinway to enter into said contract of sale is the execution of this agreement by Alstores.

\*        \*        \*        \*        \*        \*        \*

1. Alstores as Landlord, agrees to provide Steinway as Tenant, *without further payment by Steinway therefor*, with space, services and facilities in the premises to be conveyed under the aforesaid contract of sale, all as more fully set forth in the following schedule and paragraphs:

| Space to be occupied by seller | Area in square ft. | Term of occupancy from closing of title |
| --- | --- | --- |
| [Various locations are here described broken down as to floor.] | [Total on all floors but third=131,952.] | Two and one-half years. |
| Entire third floor_____ | 45,446_____ | Two months. |

2. In addition to the space outlined above, Alstores, as Landlord, shall provide Steinway, as Tenant, with free and undisturbed access, jointly with Alstores, to all of the common facilities of the building, including but not limited to all truck bays, driveways, elevators and that portion of the second floor where the time clocks are presently located. In addition, Alstores, as Landlord, shall provide Steinway, as Tenant, during the term set forth above, without additional charge therefor with heat, electricity and water in the same manner and to the same extent as Steinway, as Landlord, has heretofore provided such services to Alstores' affiliate, Stern Brothers, as Tenant. Alstores further agrees that any alteration or construction work which it or its said affiliate may undertake shall not, during the term above set forth, unduly interfere with Steinway's use of the space set forth above and/or Steinway's production facilities.

3. It is understood and agreed that if any portion of the space to be used and occupied by Steinway as hereinabove provided for shall, during the term set forth above, be so damaged or destroyed by fire or other cause as to render same unusable by Steinway in its business operations or if Alstores shall be unable or unwilling to provide Steinway with the quiet enjoyment thereof, whether such failure shall result from Act of God, action of any governmental authority or action or neglect on the part of Alstores, its successors or assigns, or if for any reason whatsoever, other than Steinway's acts, Steinway's use and occupancy of such space or any part thereof is destroyed or substantially impaired, Alstores shall, during any such period, pay to Steinway, on the 1st day of each and every month, during the balance of the term above set forth, a sum equivalent to six and one-quarter (6¼) cents per square foot for that portion of the space so affected.

4. Steinway, as Tenant, shall have the right, from time to time, to terminate the tenancy, or any part thereof, as of the expiration of two years from closing of title under the aforesaid contract of sale, or any time thereafter during the term, in each instance upon not less than sixty (60) days prior written notice to that effect, in which event, Alstores shall pay to Steinway on the 1st day of each and every month during the balance of the term, a sum equivalent to six and one-quarter (6¼) cents per square foot for that portion or portions of the

space as to which Steinway's tenancy has been so terminated, provided, however, that Steinway's right to terminate as hereinabove set forth shall not apply to units of space less than a wing of a floor.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

6. Except as hereinabove otherwise expressly provided, all of the terms and conditions of the Standard Form of Loft Lease of the Real Estate Board of New York, Inc., shall apply and extend to Steinway's tenancy during the term thereof.

[Emphasis supplied.]

Pursuant to the sale contract and the space occupancy agreement, closing of the transaction took place on February 1, 1957. On that date there was a simultaneous closing of the fee (petitioner to Alstores), a net lease agreement, Alstores leasing to Stern Bros. (subject to the rights of Steinway), and a mortgage (Alstores to New York Savings Bank). On that date Alstores placed a signed endorsement on the space-occupancy agreement specifying that it "shall survive the delivery of the deed" to the property conveyed. At the closing Alstore's house counsel, who was also secretary of Alstores Realty Corp., submitted to the title company which insured the mortgagee his affidavit stating that the subject premises were "subject, for the purposes of said mortgage, to leases to Stern Bros. and Steinway & Sons, which covered the entire premises."

The deed from petitioner to Alstores contained no reservation or exception whatsoever. The deed had affixed thereto when delivered by petitioner to Alstores, U.S. revenue stamps in the amount of $1,103.85. Said sum of $1,103.85 constitutes the stamps required by the Internal Revenue Code to be affixed where the transfer involves a consideration slightly in excess of $1,003,000. The deed was recorded in due course.

Petitioner made a journal entry on its books as of February 1, 1957, the date of closing of the subject transaction, establishing an account titled "Prepaid Rent-Ditmars #2," in the amount of $253,090.75.[2] This account was thereafter credited in the amount of $11,087.38 at the end of February 1957, and at the end of March 1957. Thereafter, a credit was made in the amount of $8,247 each month until July 1959, the end of the 2½-year term of occupancy under the space-occupancy agreement, the last such entry reducing the account to zero. Each of these monthly entries was in the amount of the fair rental value of the total space which petitioner was entitled to occupy that month under the space-occupancy agreement.

By mutual agreement between Stern Bros. and petitioner, petitioner commencing approximately 1 year from date of conveyance of

---

[2] This amount apparently represents the total square feet of space which petitioner was entitled to occupy multiplied by 6¼ cents per month for the 2½ year term. The fair rental value of space in the subject premises throughout the years in question was 6¼ cents per square foot per month.

title to Alstores, began to vacate portions of the space which it was entitled to occupy under the space-occupancy agreement with Alstores. Stern Bros. accepted the space so vacated and paid petitioner periodically therefor at the rate of 6¼ cents per square foot per month. The aggregate amount paid to petitioner by Stern Bros. during the calendar years 1958 and 1959 for the space vacated by petitioner and taken over by Stern Bros. was $89,446.36, $33,139.61 in 1958, and $56,306.75 in 1959.

Petitioner reflected the above-described transactions in the following manner in its tax returns: The sale of the subject premises was reported as a long-term capital gain in 1957, the fair market value of the space-occupancy agreement, $253,090.75, being added to the $750,000 cash received in determining the selling price (or amount realized). A "prepaid rent" account of $253,090.75 was established and the annual amortization of this account, to the extent it exceeded the cash payments received from Stern Bros., was deducted annually by petitioner as a rent expense.

Respondent determined that the amount realized on sale of the subject premises did *not* include the fair market value of the space-occupancy agreement, but *did* include the periodic payments received from Stern Bros. in 1958 and 1959. In the deficiency notice for 1958 respondent increased petitioner's capital gains income by $33,139.61 with the explanation that such amount received upon release of space to the purchaser and used by petitioner to reduce rent expense was additional sales price or received on cancellation of lease. In the 1959 deficiency notice respondent increased petitioner's capital gains income by $56,306.75, the amount of periodic payments to petitioner by Stern Bros. that year for the release of space, but his explanation was only that this sum represents receipts from Stern Bros. deemed to be an addition to the sales price of the property under the sales agreement of 1957. He further determined that petitioner was entitled to no deduction for rent expense on account of the transaction here in question.

#### ULTIMATE FINDINGS OF FACTS

The fair rental value of space in the subject premises throughout the years here in question was 6¼ cents per square foot per month. The fair market value as of February 1, 1957, of petitioner's rights-of-occupancy under the space-occupancy agreement was $253,090.75.

The space-occupancy agreement was part of the consideration bargained for by and paid to petitioner by Alstores for the conveyance of petitioner's property and it, together with the cash payment of $750,000, constituted the total consideration for the sale consummated on February 1, 1957.

Petitioner's cost of acquiring its leasehold interest under the space-occupancy agreement was $253,090.75.

## 380

Petitioner contends that the subject premises were sold in 1957 for a total consideration (or "amount realized" under sec. 1001(b))[3] of $1,003,090.75, consisting of $750,000 cash plus a 2½-year rent-free leasehold with a fair market value of $253,090.75. Petitioner contends further that the leasehold interest acquired in 1957 had a cost basis of $253,090.75, and that petitioner is entitled to rent expense deductions in the form of amortization of the basis over the 2½-year period of occupancy. Respondent asserts that petitioner never made any rental payments nor was it under any contractual obligation to make rental payments, that its occupancy was expressly made rent free, and that the claimed deductions do not qualify under section 162(a)(3).[4]

The transaction at issue herein has already been considered by this Court in *Alstores Realty Corp.*, 46 T.C. 363 (1966), in which we were faced with the question whether Alstores realized taxable rent income as a result of the purchase and simultaneous space occupancy agreement. In the *Alstores* case we held that Alstores had in substance as well as in form[5] acquired real estate worth $1,003,090.75, paying consideration in the form of $750,000 cash plus a rent-free lease worth $253,090.75, and that to the extent the value of the premises acquired exceeded the cash paid, Alstores realized taxable rent income. Our analysis of the subject transaction in *Alstores Realty Corp.*, *supra*, is controlling in the instant case.

Although petitioner's arguments on brief in the instant case seem aimed primarily at refuting the principal contention of the taxpayer in the *Alstores* case[6]—that in substance Steinway conveyed only a remainder interest and reserved in itself an estate for years—respondent here does not make such a contention. Our holding in *Alstores* makes clear that the transaction in question was in substance as well as in form a sale and leaseback, and we need not repeat here our reasons for so holding in that case.

Respondent's only legal argument in the instant case is that petitioner has failed to show that the claimed "rent expense" falls within any section of the Code permitting a deduction. *New Colonial Ice Co. v. Helvering*, 292 U.S. 435 (1934). We reject this argument. In our

---

[3] All statutory references are to the Internal Revenue Code of 1954.

[4] SEC. 162. TRADE OR BUSINESS EXPENSES.

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

\* \* \* \* \* \* \*

(3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.

[5] Alstores had argued that in substance the transaction was a sale by Steinway of a *remainder* interest only, with Steinway reserving in itself a legal estate for years.

[6] The *Alstores* and *Steinway* cases, though not consolidated, were tried during the same trial calendar and were assigned identical briefing dates.

opinion the manner in which petitioner treated the transaction in issue was proper in all respects and amply supported by the evidence of record. We hold that respondent erred in disallowing the claimed deduction.

On February 1, 1957, petitioner conveyed real estate worth $1,003,-090.75 in exchange for $750,000 cash plus a contractual right-of-occupancy worth $253,090.75. In both form and substance petitioner acquired a 2½-year leasehold interest at a cost of $253,090.75. *Alstores Realty Corp., supra.* It is well settled that the cost of acquiring a leasehold interest is a capital expenditure, recoverable through amortization over the remaining life of the lease. *University Properties, Inc.,* 45 T.C. 416 (1966), on appeal (C.A. 9, Apr. 27, 1966), and cases cited therein at page 421; sec. 1.162–11(a), Income Tax Regs. Petitioner amortized its capital investment in the subject leasehold on its books of account, and it deducted in its tax returns so much of its annual amortization as exceeded the amount received from Stern Bros. for petitioner's space which petitioner relinquished for occupancy by Stern Bros. Clearly, such leasehold amortization is deductible under section 162, even though there are no periodic payments designated as rent. Petitioner deeded the subject property offered for sale at a "rock bottom price" of $1 million for $750,000 in cash and a leaseback of the portions of the warehouse it needed until new facilities were available.

Respondent repeatedly urges that the agreement between the parties provided for rent-free occupancy by petitioner of space in the subject property. We cannot agree. The agreement specifies that Alstores as landlord shall provide Steinway as tenant with space, services, and facilities in the premises to be conveyed "without further payment" by Steinway.

Respondent also asserts that the leasehold interest had no value. To the extent that this contention would lead to a conclusion (not clearly expressed by respondent) that the leasehold had no amortizable cost basis, we reject it. Petitioner presented cogent evidence, including the testimony of a highly qualified, expert real estate appraiser, that the leasehold had a fair market value of $253,090.75 as of February 1, 1957.

Portions of the premises were leased to other tenants at 6¼ cents per square foot per month or more. Obviously, the leasehold had great value not only to Steinway but to others at the time.

This presupposes payment in full already made for the leasehold conveyed.

Evidence is also plentiful that the subject premises had a fair market value of $1,003,090.75 on the date of conveyance. Petitioner and Alstores were both intimately familiar with the subject premises,

both were dealing at arm's length through real estate brokers and with advice of counsel. In the absence of evidence to the contrary, it can only be concluded that the value of the business property conveyed was equal to the value of the cash and leasehold interest received. The evidence before us permits no other conclusion. *Moore-McCormack Lines, Inc.*, 44 T.C. 745 (1965), on appeal (C.A. 2, Jan. 21, 1966).

We hold, therefore, that petitioner's leasehold interest had an amortizable basis equal to its fair market value at time of acquisition, or $253,090.75 as reported by petitioner. This was the amount paid for the leasehold by petitioner when it was acquired. We conclude that respondent erred in disallowing the rent deductions claimed with respect to the subject premises. The Commissioner's regulations specifically provide as follows:

Sec. 1.162–11 Rentals.

(a) *Acquisition of a leasehold.* If a leasehold is acquired for business purposes for a specified sum, the purchaser may take as a deduction in his return an aliquot part of such sum each year, based on the number of years the lease has to run. * * *

Respondent also erred in adjusting the amount of capital gain reported as realized on the sale of the subject premises to the extent that such adjustment was based upon his disallowance of the above-mentioned rent deductions and his determination for 1957 that $253,090.75 of the selling price reported should be eliminated. The appropriate adjustments to reflect the proper treatment of the entire transaction as determined herein, together with other adjustments not contested or settled by stipulation, may be made in a Rule 50 computation.

*Decisions will be entered under Rule 50.*