ELWOOD C. GIBERSON AND MARJORIE H. GIBERSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; ELWOOD C. GIBERSON CO., INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Giberson v. Commissioner
Docket Nos. 10106-79, 10107-79.[1]
United States Tax Court
T.C. Memo 1982-338; 1982 Tax Ct. Memo LEXIS 413; 44 T.C.M. (CCH) 154; T.C.M. (RIA) 82338; June 16, 1982. Walter T. Hart, for the petitioners. Christy M. Pendley, for the respondent. SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge:* Respondent determined deficiencies in petitioners' Federal income tax as follows: Docket No.
Year
Amount
10106-79
1976
$8,854.00
10107-79
1976
4,372.87
Due to concessions by petitioners, the issues remaining for our *415 decision are: 1. Whether medical reimbursement payments by the Elwood C. Giberson Co., Inc., to Mr. Elwood C. Giberson, its president and 100 percent joint shareholder, were made pursuant to a plan qualifying under section 105; [2]
2. Whether the corporation may deduct such payments as ordinary and necessary business expenses under section 162; and 3. Whether petitioners realized prepaid rental income when they purchased a residence by assuming an outstanding mortgage, paying back real estate taxes, and simultaneously leasing the property back to the seller for five years at a bargain rental rate. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein. Issues 1 and 2.
Petitioners Elwood C. Giberson (hereinafter Mr. Giberson) Marjorie H. Giberson (hereinafter Mrs. Giberson) are husband and wife. They resided in Des Moines, Iowa, when they filed the *416 petition in Docket No. 10106-79. Mr. Giberson designs and sells ventilation systems primarily to the food processing industry. He and Mrs. Giberson founded the business as a partnership in 1947 and incorporated it in 1959. Mr. and Mrs. Giberson jointly own all of the capital stock of the corporation. Mr. Giberson has been president and Mrs. Giberson the secretary and treasurer of the corporation since incorporation. They alone comprise its board of directors. The corporation's principal place of business was in Des Moines, Iowa, when the petition in Docket No. 10107-79 was filed. On August 1, 1960, the board of directors passed a resolution offering to pay two-thirds of employees' medical insurance premiums after six months' continuous employment with the corporation. The plan was augmented by a second resolution adopted on July 5, 1965. It provided that the corporation would pay for all medical expenses of the president, Mr. Giberson, and his dependents, except for one-third of his insurance premiums which he would continue to pay. Subsequently, on January 7, 1975, the board of directors resolved that the corporation would pay total medical insurance premiums covering Mr. *417 and Mrs. Giberson and their dependents. Mr. Giberson was in good health when the medical reimbursement plan was adopted in 1965. During 1976, the corporation employed six persons, including Mr. Giberson who was designer and salesman; Mrs. Giberson who was bookkeeper, head of collections and chief financial officer; a salesman; a serviceman who also maintained boilers; a secretary and bookkeeper; and a part-time employee whose duties have not been described to the Court. [3]
On its corporate income tax return for 1976, the corporation deducted medical expenses paid to and for the benefit of Mr. and Mrs. Giberson and their children in the amount of $5,076. [4] In addition, the corporation deducted $2,315.18 for employee health insurance premiums. It paid for the Gibersons' medical insurance in full and covered two-thirds of the cost of insurance of all other employees in that year. *418 In his statutory notice of deficiency, the respondent determined that the amounts the Gibersons received in 1976 in payment of medical expenses were dividends which were includible in their income under section 61. [5] The respondent disallowed the corresponding corporate deductions for medical payments to or for the benefit of the Gibersons because this amount was not paid pursuant to a plan qualifying under section 105. Issue 3.
In January 1976 petitioners purchased a residence in Cedar *419 Falls, Iowa, from Charlotte Giberson (hereinafter Charlotte), the divorced wife of Elwood Giberson's now-deceased brother. Following the divorce, Charlotte realized she could not afford the carrying costs associated with ownership of the house. [6] Petitioners estimated the fair market value of the Cedar Falls property to be $43,697 [7] in January 1976. The parties negotiated at considerable length over *420 the sale of the house. The substance of their discussions was committed to paper in a letter from petitioners to Charlotte dated December 27, 1975. Mr. Giberson stated: * * * In this proposed transaction, you are relinquishing your valuable equity to your home to Marjorie and to me in exchange for a five year lease of the home to you at a low rental rate. Now, Marjorie and I are not acting out of a sense of charity. I want you to know how Marjorie and I view the transactions from a strictly business point of view. We expect to profit from the transaction * * *. Furthermore, we need your help in keeping down our maintenance cost so we can make the profit we anticipate. [8] * * * In addition to *421 the anticipated gain of $10,087.00 due to inflation, Marjorie and I gain a reduction in State and Federal income taxes because interest and taxes are deductible. * * * On January 8, 1976, Charlotte conveyed the Cedar Falls property to petitioners in consideration of their assumption of the outstanding mortgage on the property of $30,500, payment of back real estate taxes of $1,329.16 and utility and maintenance bills of $725. Simultaneously, petitioners leased the property back to Charlotte for exclusive use as a residence for five years at a monthly rental of $150. The warranty deed conveyed the real estate in fee simple. Its terms did not include the reservation of any estate for years to Charlotte. As part of the deal, petitioners agreed to pay the tax, insurance, and major maintenance costs of the Cedar Falls property during the leasehold, but not the utilities which were borne by the lessee. Petitioners drew the lease on a preprinted Iowa Real Estate Association form. By its terms, use of the premises was restricted to residential purposes. In his statutory notice of deficiency the Commissioner determined that petitioners received prepaid rental income of $13,197 *422 which represented the excess of the fair market value of the property, $43,697, over the balance of the mortgage assumed, $30,500. On brief, respondent reduced this adjustment to $11,867.84 to include in the purchase price the back real estate taxes of $1,329.16 petitioners paid as part of the consideration tendered for the property. [9]
ULTIMATE FINDINGS OF FACT 1. The fair market value of the Cedar Falls property was $43,697 in January 1976. 2. Petitioners purchased the Cedar Falls property in fee subject to a five-year lease. OPINION Issues 1 and 2.
Petitioners contend that the corporation paid their medical expenses pursuant to a qualified plan, of which the reimbursement provision is founded on Mr. Giberson's role as key employee of the corporation; thus, such payments are excludible from his joint income under section 105(e). Respondent maintains that the corporation had two plans--one providing for payments of medical insurance premiums and a second, supplemental reimbursement plan which benefitted the Gibersons in *423 their capacity as owners rather than as employees of the corporation. [10]
Section 105 provides generally that amounts received under accident and health plans are excludible from gross income.[11]Section 1.105-5(a), Income Tax Regs., provides definitive guidelines as to what constitutes an accident or health plan. For example, a plan may cover one or more employees and different plans may be established for different employees or classes of employees. An employee's rights need not be enforceable, but if so, he must be covered by a plan and notice or knowledge of such plan must be communicated to him as a definite policy through the plan need not be in writing. Section 1.105-5, Income Tax Regs.Lang v. Commissioner,41 T.C. 352 (1963). In addition, the plan must exist for the benefit of employees, as opposed to shareholders. Larkin v. Commissioner,48 T.C. 629 (1967), affd. 394 F.2d 494 (1st Cir. 1968). *424 Respondent concedes the medical insurance plan established in 1960 is qualified but urges that the existence of the supplemental reimbursement plan was not revealed to employees other than the shareholders and that the failure to include nonshareholder employees constitutes irrational discrimination. It is clear that a plan, as defined in section 1.105-5(a), Income Tax Regs., existed when Mr. Giberson received the reimbursements from his corporation. Although the plan was not in writing, the resolutions adopted by the board of directors were reported in the corporate minutes. The reimbursement provision was known to Mr. Giberson, the only employee it covered. Benefits under the plan were definite in amount and were not paid on an ad hoc basis. Compare Larkin v. Commissioner,supra, and Lang v. Commissioner,supra, with Bogene, Inc. v. Commissioner,T.C. Memo. 1968-147. Under these circumstances, we hold that a plan, as defined in section 105, existed of which the reimbursement provision formed a part. We are then left with the narrow question whether the plan is "for employees," that is, whether there is some rational *425 basis for providing full medical coverage to Mr. Giberson and his dependents, the owner-employee of the business, while only partially covering all other nonshareholder employees. We said in Levine v. Commissioner,50 T.C. 422, 427 (1968): [t]here must be some rational basis other than ownership of the business to justify discrimination among employees; i.e., that the so-called sick pay in question must in fact represent bona fide sick pay for employees rather than distributions to stockholders. * * * [Emphasis supplied.] Mr. Giberson testified that his duties in the corporation included designing ventillation systems for the food processing industry, negotiationg contracts, and, as chief executive of the company, providing direction to it. He was responsible for over 70 percent of the sales realized by the corporation in 1976. With respect to skill and level of responsibility, his duties clearly distinguished him as a key employee. He testified that the genesis of the reimbursement plan was to provide him with a level of benefits commensurate with his responsibilities in the business. [12] He was in good health when the supplemental plan was adopted. *426 [13] We find his testimony to be candid and credible. Respondent's reliance on John H. Kennedy, Inc. v. Commissioner,T.C. Memo. 1977-210, and Smithback v. Commissioner,T.C. Memo. 1969-136, is misplaced. These cases are clearly distinguishable. In both cases no other employee received benefits except the sole stockholder of each business. By contrast, the corporation herein paid two thirds of the cost of medical insurance for all nonshareholder employees. Nor do we accept respondent's characterization of the medical reimbursements to petitioners as distributions of corporate dividends. Nothing in section 105 precludes an employee who is also a shareholder and corporate officer from enjoying that section's tax benefits. [14] We find that *427 the supplemental plan was established on a reasonable basis for Mr. Giberson's benefit as an employee. [15] On the basis of the record before us, we conclude that medical payments to or for the benefit of petitioners were made under a plan for employees and not for shareholders. Accordingly, amounts received by petitioners under the plan are excludible under section 105(b). A corporation may deduct expenditures for a medical benefit plan if they are ordinary and necessary. Section 1.162-10(a), Income Tax Regs. We find on this record that they were ordinary and necessary. Consequently, the corporation is entitled to a deduction for medical payments as business expenses under section 162 (a). [16]
*428 Issue 3.
We must decide whether petitioners received additional income in 1976 when they purchased property under an agreement by which the consideration was substantially below fair market value but the property was leased back to the seller for a fixed term at a rent based on what the seller could afford. Relying on Kreusel v. United States, an unreported case ( D. Minn. 1963, 12 AFTR 2d 5701, 63-2 USTC par. 9714), petitioners contend that less than the fee interest was conveyed and that the parties intended to carve an estate for years out of it. Respondent cites Alstores Realty Corp. v. Commissioner,46 T.C. 363 (1966), in support of his position that the entire fee interest was conveyed because petitioners bore the risks and burdens of ownership during Charlotte's tenancy. The resolution of this issue turns on whether petitioners purchased an entire fee interest without reservation and leased the property back to the vendor for a five-year period, or whether they purchased a remainder interest in it. Cf. Ellerv. Commissioner,77 T.C. 934 (1981). The issue is factual, and petitioners bear the burden of proving *429 respondent's determination incorrect. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). We have carefully examined the record and authorities cited by petitioners in this case. It presents a close question. However, we conclude that petitioners have not persuasively shown that they purchased no more than a remainder interest. In the form which Charlotte and the petitioners themselves chose, the transaction was cast as a sale and leaseback. This Court requires that a party seeking to upset the form of a transaction furnish strong proof that what occurred, in substance, differs from what the form indicates. Ullman v. Commissioner,264 F.2d 305 (2d Cir. 1959), affg. 29 T.C. 129 (1957); Buffalo Tool & Die Mfg. Co. v. Commissioner,74 T.C. 441, 446 (1980); Hummel v. Commissioner,T.C. Memo. 1970-341. Petitioners have not satisfied this difficult burden. The warranty deed from Charlotte to petitioners is unequivocal on its face. It conveys title to the property in fee simple without reservation. Petitioners' letter to Charlotte, dated December 27, 1975, expressing the underlying agreement between *430 the parties, speaks of "the transfer of ownership of your home to us, and our lease back [sic] agreement with you." Finally, paragraph 14 of the lease provides that upon failure of the lessee to observe the terms of the lease, the lessor may declare a forfeiture of the lease and the lessee's rights thereunder. By their terms, these documents do not purport to reserve an estate for years to Charlotte. In addition, petitioners appear to have borne the risks and burdens of ownership during the leasehold. During 1976 and the ensuing three years, they paid the real estate taxes and insurance premiums on the property [17] as well as major maintenance. [18] Petitioners have not demonstrated that these outlays were the subject of negotiations between the holder of an estate for years and the remaindermen. *431 We have also considered the parties' intentions. Mr. Giberson testified that he proposed to "purchase the property for an appraised value of $43,600 with an encumbering lease for five years." Again, in his letter to Charlotte, dated December 27, 1975, he proposed "purchasing your home * * * as per the lease agreement attached and at a rental rate of $150.00 per month." Surely, had Charlotte sold less than the fee interest in her home, she would not have been required to pay rent to enjoy her reserved term. Such a notion flies in the face of an intention to reserve an interest in the seller. We think Kreusel v. United States, an unreported case ( D. Minn. 1963, 12 AFTR 2d 5701, 63-2 USTC par. 9714), is distinguishable. There, taxpayers sold farm property which they owned in fee to a third party but remained on it in accordance with a rent-free right of occupancy for their lives plus six months. The issue was whether the texpayers had sold the fee or only a remainder interest. In holding for the taxpayers, the Court determined that the whole contract of sale, firmly supported by testimony, indicated the parties' intention to reserve an interest in the selling *432 party. There is nothing in the record here to suggest that Charlotte wished to preserve her right of occupancy as a reserved term for years rather than a lease, or that petitioner preferred to acquire the house by remainder rather than in fee subject to leaseback. [19]Eller v. Commissioner,supra at 960. We decide on this record that the parties intended and effected a sale-leaseback.
There remains the onerous task of valuing petitioners' leased fee interest. [20] Respondent contends it should be measured by the difference between the fair market value of the property in January 1976 and the purchase price.Petitioners argue that the price paid was not greater than the value of the leased fee interest. In the alternative, they contend "prepaid rent" should be limited to the difference *433 between the fair rental value and the rent received over the leasehold. Petitioners' expert appraiser, James T. Hayes, Jr., defined the leased fee interest as the present worth of the right to receive the net income flow over the period of the lease, coupled with the present worth of the reversionary value of the property at the end of the lease. Applying a cost approach to the reversion component of value, he computed a reversionary value of $28,900.90. [21] Then, without calculating the present worth of the contract rent, he merely asserted that a further reduction in the present value of the property in January 1976 resulted from the fact that annual expenditures for taxes, insurance and maintenance exceeded annual income over the lease. *434 While we agree with his use of the cost approach to value petitioners' leased fee interest, we are struck by three conspicuous omissions in his analysis. First, he did not assign a separate value to the land. Second, he failed to provide for depreciation of the dwelling over the lease. Third, he did not take into account the present value of the contract rent over five years. Without these factors his leased fee interest calculation is meaningless.See American Institute of Real Estate Appraisers, The Appraisal of Real Estate (7th ed., 1978), pp. 473-478. Respondent, on the other hand, presented no expert testimony in support of his valuation. He erroneously relied on the method employed in Alstores Realty Corp. v. Commissioner,supra, in a factual context at odds with that now before the Court. In Alstores Realty the seller enjoyed a rent-free right of occupancy of a portion of the premises for two and one-half years. He recorded on his books prepaid rent *435 in an amount equal to 6-1/4 cents per square foot per month which was the same rate the accrual basis purchaser was paying the seller under an existing lease for portions of the building. The respondent determined that the prepaid rent was additional income to the purchaser in the year of the sale. By contrast, we have here cash basis taxpayers who received fixed rental payments over the lease term which were based on the seller's ability to pay rather than what the property might command. We find respondent's determination meritless because of its apparent total reliance on a formula which is not relevant here. We are satisfied that there is enough evidence of record for the parties to make the recessary calculations or otherwise come to an agreement on the value of petitioners' leased fee interest under the factors described on page 18, supra, as well as those set forth in the American Institute of Real Estate Appraisers, The Appraisal of Real Estate,supra, pp. 473-478. Decisions will be entered under Rule 155.
Footnotes
1. These cases have been consolidated for purposes of trial, briefing and opinion.↩
*. These cases were tried before Judge Cynthia Holcomb Hall who subsequently resigned from the Court. By order of the Chief Judge dated February 8, 1982, the cases were reassigned to Judge Perry Shields↩ for disposition.
2. All statutory references are to the Internal Revenue Code of 1954, as in effect during the year in issue. Unless otherwise indicated, any reference to "Rules" shall be deemed to refer to the Tax Court Rules of Practice and Procedure.↩
3. The salaries paid to those employees in 1976 were: ↩
Elwood C. Giberson
$36,500.00
Marjorie H. Giberson
12,500.00
C. Edward Truslow (salesman)
23,100.00
John Pokos (serviceman)
21,706.04
Virginia Sissel (secretary and bookkeeper)
7,199.59
Debra Blake (part-time)
3,118.21
4. This amount comprised $2,748.10 in reimbursements to petitioners for doctors' fees, hospital charges, and eyeglasses and $2,333 paid by the corporation for medical travel expenses. Since petitioners concede $215 of the latter category of expenses were personal and nondeductible, only $4,866.10 of medical payments to or for the benefit of petitioners remain in dispute.↩
5. Although the respondent determined in Docket No. 10106-79 that corporate payments of $4,866 for petitioners' medical expenses were includible in their income, the parties stipulated to payments of $4,861. In the absence of any explanation for the $5.00 difference, we find that the latter amount controls.↩
6. In a letter to Charlotte dated December 27, 1975, Mr. Giberson estimated she would require a monthly cash flow of $424.93 to remain owner of the property, consisting of: Mortgage principal and interest
$242.43
Taxes $1,350/year
112.50
12 months       Insurance $240/year
20.00
12 months          Major maintenance, estimated Plumbing, electrical, heating, roof repair, doors, windows, but not including paint and decorating. ** Not including utilities.
*↩
50.00 ** $424.93
7. The property had been appraised in June 1974 at $38,500. To this figure petitioners added $5,197.50 based on nine percent "added value due to inflation" for 1-1/2 years to arrive at petitioners' estimate of then-current fair market value.↩
8. Petitioners anticipated a gross profit of $10,087.00 on their investment, calculated as follows: ↩
Value of property on January 1, 1976
$43,697.00 Inflation - 5 percent/year
Anticipated sales price in January 1981
$55,769.67 Less mortgage balance due in January 1981
( 28,887.00)
Less out of pocket cash flow for
60 months ($429.93 costs -
$150.00 rent) times 60
( 16,795.80)
Gross profit from sale of property in January 1981
$10,087.00 9. There is no explanation in the record why respondent did not include the back paid utility and maintenance bills in the purchase price.↩
10. However, respondent concedes that Mrs. Giberson received medical benefits as a dependent of Mr. Giberson rather than directly through a specific plan provision.↩
11. Section 105 provides in pertinent part: (a) AMOUNTS ATTRIBUTABLE TO EMPLOYER CONTRIBUTIONS.--Except as otherwise provided in this section, amounts received by an employee through accident or health insurance for personal injuries or sickness shall be included in gross income to the extent such amounts (1) are attributable to contributions by the employer which were not includible in the gross income of the employee, or (2) are paid by the employer. (b) AMOUNTS EXPENDED FOR MEDICAL CARE.--Except in the case of amounts attributable to (and not in excess of) deductions allowed under section 213 (relating to medical, etc., expenses) for any prior taxable year, gross income does not include amounts referred to in subsection (a) if such amounts are paid, directly or indirectly, to the taxpayer to reimburse the taxpayer for expenses incurred by him for the medical care (as defined in section 213(e)) of the taxpayer, his spouse, and his dependents (as defined in section 152). (e) ACCIDENT AND HEALTH PLANS.--For purposes of this section and section 104 (1) amounts received under an accident or health plan for employees, shall be treated as amounts received through accident or health insurance.↩
12. Cf. Smithback v. Commissioner,T.C. Memo. 1969-136↩, wherein we found the purpose of the plan to be the avoidance of taxation. 13. Cf. Leidy v. Commissioner,T.C. Memo. 1975-340. In Leidy↩ a medical plan covering the 100 percent joint shareholders was adopted a few days after petitioner learned from his doctor that he suffered from a serious heart condition.
14. Bogene, Inc. v. Commissioner,T.C. Memo. 1968-147↩. However, we draw no conclusion as to whether the medical reimbursement plan would satisfy the nondiscrimination requirement of section 105(h), effective for claims filed and paid in taxable years beginning after December 31, 1979.See sec. 366, Revenue Act of 1978, Pub. L. 96-600, 92 Stat. 2763. 15. See Epstein v. Commissioner,T.C. Memo. 1972-53↩.
16. Smith v. Commissioner,T.C. Memo. 1970-243↩.
17. Although the insurance policy was not introduced into evidence, from the tenor of the parties' agreement and Mr. Giberson's testimony, we do not doubt that petitioners were the insured. ↩
18. The fact that the tenant was responsible for upkeep of the yard and snow shoveling does not change our conclusion. While these chores may be associated with home ownership, they often are performed by lessees.↩
19. It is unfortunate that Charlotte was unable to testify for we are left to conjecture how she viewed the transaction and reported the sale. If she sold only a remainder interest, she would have had to allocate the basis between the reserved interest and the remainder. Sec. 1.61-6(a), Income Tax Regs.; Hunter v. Commissioner,44 T.C. 109, 115↩ (1965).
20. Respondent's characterization of this value as "prepaid rent" does not bear scrutiny. Petitioners are cash basis taxpayers who negotiated the payment of contract rent over a fixed term as part of the purchase agreement.↩
21. This figure represented the present value of the anticipated reversion of the property at the expiration of the lease discounted at the rate of 8-3/4 percent per annum. $43,960 His use of $43,960 rather than petitioners' estimated value of $43,697 was not explained. ** This "reversion factor" reflects the present value of $1.00 to be received in five years.
*↩ X 0.65743629 ** = $28,900.90.