WALT E. ELLER AND DOROTHY M. ELLER, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

WALT ELLER TRAILER SALES OF MODESTO, INC., AND WALT
ELLER TRAILER SALES OF MERCED, INC., PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3249–80, 3250–80.     Filed October 29, 1981.

*Gregg M. Anderson* and *Jean A. Deeds*, for the petitioners.
*Catherine L. Wong*, for the respondent.

DAWSON, *Judge*: Respondent determined the following deficiencies in petitioners' Federal income taxes:

| Petitioner | Docket No. | T.Y.E | Deficiency |
|---|---|---|---|
| Walt E. Eller and | 3249–80 | 12/31/72 | $1,265 |
| Dorothy M. Eller | | 12/31/73 | 20,183 |
| Walt Eller Trailer | | | |
| Sales of Modesto, Inc. | 3250–80 | 8/ 1/74 | 5,028 |
| Walt Eller Trailer | | | |
| Sales of Merced, Inc. | 3250–80 | 7/31/74 | 8,454 |

These cases have been consolidated for purposes of trial,

briefing, and opinion. After concessions by the parties, the issues remaining for decision are as follows:

(1) Whether income derived by petitioner Walt Eller Trailer Sales of Merced, Inc., from the operation of a commercial shopping center and a mobile home park constitutes personal holding company income (rents) within the meaning of section 543(a)(2)[1];

(2) Upon a sale of a parcel of real estate by a related partnership, whether the individual petitioners' possessory interest in a dwelling situated thereon was based on a sale and leaseback or a reservation of an estate for years; and

(3) Whether amounts paid to the three minor children of the individual petitioners constitute reasonable compensation for personal services actually rendered.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioners Walt E. Eller and Dorothy M. Eller (hereinafter Walt and Dorothy or collectively the Ellers) are husband and wife. At the time that they filed their petition in this case, they resided in Soquel, Calif. They filed joint Federal income tax returns for the calendar years 1972 and 1973 with the Internal Revenue Service Center at Fresno, Calif.

Petitioners Walt Eller Trailer Sales of Modesto, Inc. (hereinafter Modesto), and Walt Eller Trailer Sales of Merced, Inc. (hereinafter Merced), are both California corporations solely owned by the Ellers. At the time that they filed their petition in this case, their principal offices were located in Soquel, Calif. Modesto and Merced filed Federal income tax returns for the fiscal years ended August 31, 1974, and July 31, 1974, respectively, with the Fresno Service Center.

During 1972 and 1973, the Ellers owned and operated a mobile home park known as Golden Wheels which was located in Merced, Calif. This business was organized as a proprietorship and the net profit or loss was reported on Schedule C's. During 1972 and for the first 3 months of 1973, the Ellers

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the taxable years in issue.

owned and operated another mobile home park known as Voyage West which was located in Santa Cruz, Calif. This business was also organized as a proprietorship, and the net profit or loss was reported on Schedule C's.

During the fiscal year ended August 31, 1974, Modesto derived income from the retail sale of trailers. It maintained several sales lots, each of which was either adjacent or proximate to an Eller-owned mobile home park. During the same period, it also derived income from a partnership and from the operation of a shopping center. These sources of income will be described shortly in greater detail.

On its income tax return for the fiscal year ended July 31, 1974, Merced stated that its principal business activity was "mobile trailer sales." However, on its return it did not report any gross sales nor did it claim any deduction for cost of goods sold. Like Modesto, it reported income from a partnership and from the operation of a shopping center.

In 1963, Modesto, Merced, and the Ellers formed a partnership. The partnership owned and operated a mobile home park known as Alimur Trailer Park which was located in Soquel, Calif. The park contained approximately 150 spaces available for use by both mobile homes and travel trailers. The partnership derived virtually all of its operating income from the rental of these spaces.[2] Modesto and Merced each owned a 25-percent interest in the partnership, and the Ellers owned a 50-percent interest. Early in 1973, the partnership sold the mobile home park on a deferred payment basis. On their returns, the partners reported their distributive shares of the section 1231 gain derived from this sale as well as their distributive shares of the partnership's ordinary income, principally rents and interest.

In February 1974, Modesto and Merced purchased a commercial shopping center in Santa Cruz known as El Rancho.[3] El Rancho was a relatively small "strip" shopping center consisting of two levels with approximately 31,000 square feet

---

[2] On its 1973 information return, the partnership stated that its "principal product or service" was "rents."

[3] The record does not disclose whether El Rancho was operated in partnership form or otherwise. This matter is not, however, consequential to the disposition of any of the issues herein.

of floor space. The lower level housed a variety of small businesses; the upper level housed two apartments and four or five offices. All together there were about 22 or 23 different tenants. Modesto and Merced each owned 50 percent of El Rancho and reported the rents derived from its operation on their income tax returns.

The Ellers have three children, Michael, Patti, and John. In 1972, Michael was 12 years old, Patti was 11, and John was 7. During the taxable periods involved herein, each of the children performed a variety of services for Golden Wheels, Voyage West, the partnership, Modesto, and El Rancho.

### Additional Facts Relating to the Personal Holding Company Issue[4]

On its income tax return for the fiscal year ended July 31, 1974, Merced reported the following items of gross income:

| | |
|---|---:|
| Interest | $3,466 |
| Gross rents | 14,368 |
| Net capital gain | 47,381 |
| Partnership income | 13,504 |

Merced derived the gross rents from the operation of El Rancho. The net capital gain represents its distributive share of the gain from the sale of Alimur Trailer Park. The partnership income represents its distributive share of the partnership's ordinary income derived from the operation and subsequent sale of the park. Said income was determined as follows:

| | |
|---|---:|
| Gross rents | $5,198 |
| Interest | 8,789 |
| Sec. 1250 recapture | 140 |
| Deductions | (623) |
| | 13,504 |

Thus, apart from its net capital gain, Merced's gross income was comprised almost entirely of rents and interest.

---

[4]This issue affects only Merced.

## Additional Facts Relating
## to the Right-of-Occupancy Issue[5]

Alimur Trailer Park consisted of approximately 12 acres. Included within it was a single-family dwelling with multiple-car garage and carport. For some time, the Ellers and their three children had utilized this dwelling as their personal residence.

On January 3, 1973, the partnership entered into a written contract with two unrelated third parties for the purchase and sale of Alimur Trailer Park for $950,000. The property to be conveyed was described by the contract as follows: "4300 Soquel Dr., known as Alimur Park, 147 spaces on 12 acres more or less, excepting a single family dwelling on those premises which is to be divided from the existing property." The contract did not specifically except the appurtenances to the dwelling or any specific amount of surrounding land. It was Walt's understanding, however, that one acre of land was to be excepted. The contract provided for easements for utilities and for ingress and egress. It also obligated the purchasers to furnish all utilities without charge for a 2-year period.

The dwelling was specifically excepted from the contract because the Ellers were comfortably settled and did not have alternative housing and, further, because the purchasers did not have any immediate need for it. Before the contract was consummated, however, it was learned that the local zoning ordinance might not permit the dwelling to be severed from a parcel that was commercially zoned. The purchasers also had some reservations about the Ellers' indefinite use of the dwelling because Alimur was an adults-only mobile home park, and the constant presence of their children might prove to be a disruptive influence.

In view of the foregoing, the partnership and the purchasers renegotiated the contract to include the dwelling. The purchasers agreed to pay an additional $75,000 and further agreed to permit the Ellers and their children to occupy the dwelling rent free for a 2-year period. The purchasers' under-

---

[5]This issue affects all of the petitioners.

standing concerning the dwelling was set forth in the following letter dated January 31, 1973, addressed to the Ellers:

Reference is made to the single family dwelling on the above-property [Alimur Mobile Home Park] being sold to us. We agree to permit you and your family to occupy the main house, garage, 3 car carport and grounds appurtenant thereto called the main house for your personal use for a period of 24 months from February 14, 1973 without any cost to you. All maintenance and utilities used or consumed during the period shall be without any cost.

We shall maintain the grounds around the main house together with any exceptional maintenance during the two year period while you occupy the main house. The standard of maintenance to be substantially the same as during your ownership. You shall occupy the house free from interference from us or our agents or employees except as reasonably necessary to perform maintenance and repairs. You and your family shall be entitled to the same privacy as when you were the owner of the home. You and your family shall have and enjoy the same privileges and use of the facilities in the park on the same basis as any and all of the tenants of the park without cost to you.

The dwelling was again the subject of correspondence in a letter dated February 11, 1973, from the purchasers' attorney to the Ellers. The pertinent parts of that letter provided as follows:

Reference is made to our escrow instructions regarding the above-entitled matter [Alimur Mobile Home Park], dated January 31, 1973, in which we feel that the following items should be clarified:

1. In my letter to you regarding your lease on the single family dwelling on the premises, it was agreed by and between the parties that there would be no subletting of the premises, and that upon your vacating of the premises during the twenty-four month period, your tenancy would lapse.

\*       \*       \*       \*       \*       \*       \*

3. That the single family dwelling is sold to the buyer, including carpets, drapes and fixtures, but excluding furniture and furnishings.

If this is your understanding, would you kindly sign where indicated below.

The Ellers evidenced their agreement by executing this letter.

On February 14, 1973, the transaction was closed. A grant deed, executed by the Ellers individually and on behalf of Modesto and Merced, was delivered to the purchasers. This deed was absolute on its face and did not by its terms reserve any estate for years in the dwelling to the Ellers. Subsequent to the closing, the purchasers paid all real estate taxes and

insurance premiums on the dwelling. The Ellers and their children continued to reside in it until about February 1, 1975.

In its 1973 information return, the partnership reported the amount received from the sale of Alimur Trailer Park as $1,025,000. Each partner's distributive share of the net gain from the sale of this section 1231 asset was determined accordingly and reported on the individual and corporate income tax returns. In the notices of deficiency, respondent determined that the gain from the sale was understated by the fair market (rental) value of the 2-year right of occupancy. Respondent further determined that the fair market value of this right was $18,000. An adjustment in the amount of $9,000 was therefore made to the Ellers' income; adjustments in the amount of $4,500 were also made to the incomes of Modesto and Merced. In addition, respondent charged the Ellers with constructive dividends in the aggregate amount of $9,000 from the two corporations. The parties have stipulated that the fair rental value of the dwelling (including utilities) was $325 per month during the period of the Ellers' occupancy subsequent to the sale.

## *Additional Facts Relating to the Children's Compensation Issue*[6]

During 1972, 1973, and 1974, the Ellers' children performed a variety of services for various of their parents' businesses. They performed these services on a continuing basis after school, on weekends, and during their summer vacations, devoting considerable time and expending considerable effort. The services performed were necessary for the operation of the businesses and could not have been performed by the existing "staff." Thus, had these services not been performed by the children, a third party (or parties) would have had to have been hired.

At Alimur Trailer Park, the children were assigned a variety of responsibilities, including maintenance of the swimming pool, landscaping, and park grounds. They also read the gas and electric meters, cleaned and set up the recreation hall for various events, and mopped and cleaned the laundry room.

---

[6]This issue affects the Ellers and Modesto.

Moreover, they delivered leaflets and messages to the tenants, answered the phones in the absence of the secretary, and swept and cleaned the trailer pads and new mobile homes which were offered for sale. Finally, they performed minor repair work and assisted their father or tradesmen on larger projects and in emergency situations.

At Voyage West, the children were responsible for maintaining the grounds and cleaning and mopping the office and laundry room. They also performed minor repair work.

At Golden Wheels, the children were responsible for maintaining the swimming pool, the landscaping, and the park grounds. They registered the transient tenants, assisted in making the necessary electrical connections, and collected the nightly rental. They also cleaned the mobile homes which were offered for sale. Finally, they performed a variety of secretarial and office services.

At El Rancho, the children were responsible for cleaning the parking lot and sidewalks with an industrial sweeper and blower. They also had janitorial duties related to the public restrooms, hallways, and stairways. Moreover, they cleaned the premises after the tenants vacated. Finally, they maintained the landscaping, answered complaints, performed minor repairs, and assisted their father at all hours in emergency situations.

The children were compensated for their services by the various Eller-owned businesses which deducted the amounts paid as "outside services." These amounts were as follows:

| 1972 | Michael | Patti | John | Total |
|---|---|---|---|---|
| Voyage West | $550 | $550 | $550 | $1,650 |
| Golden Wheels[7] | 550 | 550 | 550 | 1,650 |
| Alimur Trailer Park | 557 | 770 | 550 | 1,877 |
| | 1,657 | 1,870 | 1,650 | 5,177 |
| 1973 | | | | |
| Golden Wheels | 1,334 | 1,334 | 1,434 | 4,102 |
| Alimur Trailer Park | 25 | 25 | 0 | 50 |
| | 1,359 | 1,359 | 1,434 | 4,152 |

[7]The $1,650 paid by Golden Wheels in 1972 was deducted in 1973. However, in the notice of deficiency issued to the Ellers, respondent did not make any adjustment regarding the proper year of deduction. See sec. 461(a); secs. 1.461–1(a)(1), and 1.446–1(c)(1)(i), Income Tax Regs.

| 1974 | Michael | Patti | John | Total |
|---|---|---|---|---|
| Modesto | $.3,028 | $.3,000 | $.2,000 | $ 8,028 |
| El Rancho[8] | 156 | 116 | 68 | 340 |
| | 3,184 | 3,116 | 2,068 | 8,368 |

In the notices of deficiency issued to the Ellers and to Modesto,[9] respondent determined that approximately 90 percent of the compensation paid to the children was unreasonable and disallowed that amount. The 10 percent allowed was allocated as follows:

| 1972 | Michael | Patti | John | Total |
|---|---|---|---|---|
| Alimur Trailer Park[10] | $300 | $300 | 0 | $600 |
| **1973** | | | | |
| Golden Wheels | 275 | 275 | 0 | 550 |
| Alimur Trailer Park | 25 | 25 | 0 | 50 |
| **1974** | | | | |
| Modesto[11] | | | | |
| El Rancho | 300 | 300 | 0 | 600 |

ULTIMATE FINDINGS OF FACT

(1) The partnership conveyed its entire fee interest in the dwelling without reservation and leased it back for a 2-year term for the personal benefit of the Ellers.

(2) During 1972, 1973, and 1974, the Ellers' children performed substantial services for various of the Eller-owned businesses the reasonable values of which were $4,727, $3,652, and $7,168, respectively.

---

[8]The $340 paid by El Rancho was apparently deducted by Modesto and Merced on a pro rata basis.

[9]The notice of deficiency issued to Merced does not raise any reasonable compensation issue despite Merced's 25-percent interest in Alimur Trailer Park and 50-percent interest in El Rancho.

[10]The total amount disallowed appears as an adjustment in the notice of deficiency issued to the Ellers despite the fact that they only had a 50-percent interest in the partnership. Petitioners have not, however, objected to respondent's failure to allocate the disallowance among the appropriate parties.

[11]The notice of deficiency issue to Modesto does not allocate the amount allowed between Modesto and El Rancho.

OPINION

## *Issue 1. Personal Holding Company Income*

### *The Statute*

In addition to the regular corporate income tax, a special tax is imposed by section 541 on a corporation which qualifies as a "personal holding company." This tax is equal to 70 percent of the "undistributed personal holding company income" and is designed, like the accumulated earnings tax of section 531, to discourage the use of corporations to avoid the more sharply graduated income tax imposed on individuals.[12]

Unless statutorily excepted,[13] a corporation qualifies as a personal holding company if both an income test and a stock ownership test are satisfied. Sec. 542(a). The income test is satisfied if at least 60 percent of the corporation's "adjusted ordinary gross income" is "personal holding company income." Sec. 542(a)(1). The stock ownership test is satisfied if at any time during the last half of the taxable year more than 50 percent in value of its outstanding stock is owned, directly or indirectly, by or for not more than five individuals. Sec. 542(a)(2). Only the income test is involved herein.

The key to the income test is "personal holding company income." Section 543 defines that term as follows:

(a) GENERAL RULE.—For purposes of this subtitle, the term "personal holding company income" means the portion of the adjusted ordinary gross income which consists of:

\*       \*       \*       \*       \*       \*       \*

(2) RENTS.—The adjusted income from rents \* \* \*

"Adjusted ordinary gross income" means "ordinary gross

---

[12]During the taxable periods involved herein, the maximum rate of tax for individuals was 70 percent (sec. 1) whereas the maximum rate for corporations in general was 48 percent (sec. 11). The differential was even more pronounced during the substantial period of time when the maximum rate for individuals was 91 percent. Sec. 1; secs. 11 and 12, I.R.C. 1939. Under the Economic Recovery Tax Act of 1981, the differential has been significantly reduced by the reduction of the maximum rate for individuals to 50 percent. Sec. 101(a), Pub. L. 97–34, 95 Stat. 176. In order to conform the personal holding company tax to the new maximum rate for individuals, the act also reduces said tax from 70 percent to 50 percent. Sec. 101(d)(2), Pub. L. 97–34, 95 Stat. 180.

[13]Under sec. 542(c), a number of types of corporations (e.g., banks, domestic building and loan associations, life insurance companies, and surety companies) are specifically excepted from the definition of a personal holding company.

income," i.e., gross income less gains derived from the sale or other disposition of both capital assets and assets described in section 1231(b), reduced (inter alia) by the amount of allowable deductions for depreciation and amortization, property taxes, interest, and rent to the extent that said deductions are allocable to gross income from rents.[14] "Adjusted income from rents" means the gross income from "rents" less the amount of allowable deductions for depreciation and amortization, property taxes, interest, and rent to the extent allocable thereto.

Thus, under the general rule of section 543(a)(2), personal holding company income includes the adjusted income from rents. However, that section goes on to provide that such adjusted income is not so included if both a "50 percent" test and a "10 percent" test are satisfied.[15] The first test is satisfied

---

[14]The operative terms, including the two which immediately follow in the discussion above, are defined by sec. 543(b) as follows:

(b) DEFINITIONS.—For purposes of this part—

(1) ORDINARY GROSS INCOME.—The term "ordinary gross income" means the gross income determined by excluding—

(A) all gains from the sale or other disposition of capital assets,

(B) all gains (other than those referred to in subparagraph (A)) from the sale or other disposition of property described in section 1231(b) * * *

\* \* \* \* \* \* \*

(2) ADJUSTED ORDINARY GROSS INCOME.—The term "adjusted ordinary gross income" means the ordinary gross income adjusted as follows:

(A) RENTS.—From the gross income from rents (as defined in the second sentence of paragraph (3) of this subsection) subtract the amount allowable as deductions for—

(i) exhaustion, wear and tear, obsolescence, and amortization of property * * *

(ii) property taxes,

(iii) interest, and

(iv) rent,

to the extent allocable, under regulations prescribed by the Secretary or his delegate, to such gross income from rents. The amount subtracted under this subparagraph shall not exceed such gross income from rents.

\* \* \* \* \* \* \*

(3) ADJUSTED INCOME FROM RENTS.—The term "adjusted income from rents" means the gross income from rents, reduced by the amount subtracted under paragraph (2)(A) of this subsection. For purposes of the preceding sentence, the term "rents" means compensation, however designated, for the use of, or right to use, property * * *

[15]Sec. 543(a)(2):

(2) RENTS.—The adjusted income from rents; except that such adjusted income shall not be included if—

(A) such adjusted income constitutes 50 percent or more of the adjusted ordinary gross income, and

(B) the sum of—

(i) the dividends paid during the taxable year (determined under section 562),

(ii) the dividends considered as paid on the last day of the taxable year under section 563(c) (as limited by the second sentence of section 563(b)), and

if the corporation's adjusted income from rents constitutes at least 50 percent of its adjusted ordinary gross income. The second test is satisfied if dividends for the taxable year equal or exceed the amount, if any, by which its nonrent personal holding company income[16] exceeds 10 percent of its ordinary gross income. The significance of these two tests will be discussed hereinafter. It should be noted now, however, that Merced does not contend that it satisfied these tests.

On its income tax return for the fiscal year ended July 31, 1974, Merced reported gross rents from El Rancho in the amount of $14,368 and partnership income in the amount of $13,504, of which $5,198 represented its share of the gross rents from Alimur Trailer Park. Merced contends that these rents do not constitute personal holding company income within the meaning of section 543(a)(2). As might be expected, respondent contends to the contrary. The parties have stipulated that the Court's determination of this issue governs whether Merced is a personal holding company under section 542 for its 1974 fiscal year.

## The Proposed Regulation

In support of their respective positions, both parties exclusively rely on a *proposed* regulation, section 1.543–12, Proposed Income Tax Regs., published by respondent in the Federal Register (33 Fed. Reg. 12,564) on September 5, 1968. More specifically, they rely on section 1.543–12(d)(2), Proposed Income Tax Regs., 33 Fed. Reg. 12,567, which seeks to define the term "rents" for purposes of determining personal holding company income. That section provides in relevant part as follows:

(2) *Definition of rents (including interest constituting rents).* (i) For purposes of determining personal holding company income, the term "rents"

---

(iii) the consent dividends for the taxable year (determined under section 565), equals or exceeds the amount, if any, by which the personal holding company income for the taxable year (computed without regard to this paragraph and paragraph (6), and computed by including as personal holding company income copyright royalties and the adjusted income from mineral, oil, and gas royalties) exceeds 10 percent of the ordinary gross income.

[16]For purposes of the 10-percent test, nonrent personal holding company income is computed exclusive of both rents under sec. 543(a)(2) and compensation for the use of tangible corporate property by shareholders under sec. 543(a)(6), but inclusive of all royalty income.

means compensation (however designated) for the use of, or right to use, property of the corporation. * * * The amounts considered as rents include charter fees, etc., for the use of, or the right to use, property * * *

\* \* \* \* \* \* \*

(ii) For taxable years beginning after December 31, 1967, the term "rents" does not include payments for the use or occupancy of rooms or other space where significant services are also rendered to the occupant, such as for the use or occupancy of rooms or other quarters in hotels, boarding houses, or apartment houses furnishing hotel services, or in tourist homes, motor courts, or motels. Generally, services are considered rendered to the occupant if they are primarily for his convenience and are other than those usually or customarily rendered in connection with the rental of rooms or other space for occupancy only. The supplying of maid service, for example, constitutes such services; whereas the furnishing of heat and light, the cleaning of public entrances, exits, stairways, and lobbies, the collection of trash, etc., are not considered as services rendered to the occupant. Payments for the use or occupancy of entire private residences or living quarters in duplex or multiple housing units, of offices in an office building, etc., are generally "rents". Payments for the parking of automobiles ordinarily do not constitute rents. Payments for the warehousing of goods or for the use of personal property do not constitute rents if significant services are rendered in connection with such payments.

The parties focus on subparagraph (ii) and devote their entire briefs to arguing the factual question whether Merced rendered "significant services" to the tenants of Alimur Trailer Park and El Rancho. Their arguments are thus premised on the twin assumptions that the issue is factual and that its resolution is governed by the proposed regulation. We disagree with both assumptions.

We begin by emphasizing that section 1.543–12, Proposed Income Tax Regs., is only a *proposed* regulation, presumably still under consideration, which has not been formally adopted by the Treasury Department. Accordingly, it is not entitled to the usual weight accorded to final regulations (see *F. W. Woolworth Co. v. Commissioner*, 54 T.C. 1233, 1265–1266 (1970); cf. *Estate of Lang v. Commissioner*, 64 T.C. 404, 406–407 (1975), affd. in part and revd. in part 613 F.2d 770 (9th Cir. 1980)), and will therefore be considered in this light.

The effect of section 1.543–12(d)(2)(ii), Proposed Income Tax Regs., is to incorporate into the personal holding company area a distinction between active and passive rental income. See Feldman, "Active vs. Passive Rental Income: A Questionable Result Under the Proposed Regulations for Personal Holding Companies," 6 J. Corp. Tax. 316 (1980); B. Bittker & J.

Eustice, Federal Income Taxation of Corporations and Share-holders, par. 8.22, p. 8–49 n. 126 (4th ed. 1979). Such distinction exists in a number of other areas.[17] However, it is not suggested by the language of either section 543(a)(2) or section 543(b)(3), which defines "rents" as "compensation, however designated, for the use of, or right to use, property." Similarly, such distinction is not suggested by section 1.543–1(b)(10),[18] Income Tax Regs., which substantially tracks former section 543(a)(7)[19] in defining "rents" as follows:

(10) *Rents (including interest constituting rents).* Rents which are to be included as personal holding company income consist of compensation (however designated) for the use, or right to use, property of the corporation. * * * The amounts considered as rents include charter fees, etc., for the use of, or the right to use, property * * * . However, if the amount of the rents includible under section 543(a)(7) and this subparagraph constitutes 50 percent or more of the gross income of the corporation, such rents shall not be considered to be personal holding company income.

## The Legislative History

### Revenue Act of 1934

This leaves the legislative history. Provisions relating to personal holding companies were first enacted by the Revenue Act of 1934, ch. 277, 48 Stat. 680. As originally defined by the

---

[17]See secs. 1.512(b)–1(c)(5), 1.1244(c)–1(e)(1)(iii), 1.1372–4(b)(5)(vi), and 1.1402(a)–4(c)(2), Income Tax Regs., all of which contain language substantially identical with sec. 1.543–12(d)(2)(ii), Proposed Income Tax Regs. Secs. 512, 1244, 1372, and 1402(a) deal with unrelated business taxable income of tax-exempt organizations, losses on small business stock, elections by small business corporations, and net earnings from self-employment, respectively.

[18]Sec. 1.543–0, Proposed Income Tax Regs., purports to limit the applicability of sec. 1.543–1, Income Tax Regs., to taxable years beginning before Jan. 1, 1964. Interestingly enough, sec. 1.543–1, Income Tax Regs., was amended on Feb. 26, 1973, by T.D. 7261, 1973–1 C.B. 309, 316–317, to reflect sec. 503(a), Pub. L. 91–172, 83 Stat. 630.

[19]Former sec. 543(a)(7) is the immediate ancestor of secs. 543(a)(2) and 543(b)(3). Prior to amendment by sec. 225(d) of the Revenue Act of 1964, Pub. L. 88–272, 78 Stat. 81, sec. 543(a)(7) provided as follows:

(a) GENERAL RULE.—For purposes of this subtitle, the term "personal holding company income" means the portion of the gross income which consists of:

\* \* \* \* \* \* \*

(7) RENTS.—Rents, unless constituting 50 percent or more of the gross income. For purposes of this paragraph, the term "rents" means compensation, however designated, for the use of, or right to use, property * * *

The legislative history of the personal holding company provisions is discussed at length in the following section of this opinion. Suffice it to say now that there is nothing in the legislative history of the Revenue Act of 1964 to suggest that Congress intended any modification of the definition of "rents" as set forth in sec. 1.543–1(b)(10), Income Tax Regs.

House bill, a personal holding company included "any corporation 80 per cent of whose gross income for the taxable year is derived from rents, royalties, dividends, interest, annuities, and gains from the sale of stock or securities." H. Rept. 704, 73d Cong., 2d Sess. (1934), 1939–1 C.B. (Part 2) 554, 562. The Senate, however, objected to the inclusion of rents within the definition because rents were not perceived to necessarily be in the same category as income from such passive sources like dividends and interest. Thus, the Finance Committee report states:

> The House bill includes in the income within the 80 per cent clause income from "rents." A great part of real estate business is done by small family corporations. These partake more of the nature of operating companies than mere holding companies. Your committee is of the opinion that it is unwise to include such companies within the category of personal holding companies. Therefore, the word "rents" is omitted from the definition. [S. Rept. 558, 73d Cong., 2d Sess. (1934), 1939–1 C.B. (Part 2) 586, 596–597.]

The Senate version of the bill prevailed. Conf. Rept. 1385, 73d Cong., 2d Sess. (1934), 1939–1 C.B. (Part 2) 627, 630–631. Thus, section 351(b)(1), Revenue Act of 1934, ch. 277, 48 Stat. 751, was enacted to provide as follows:

> SEC. 351. SURTAX ON PERSONAL HOLDING COMPANIES.
> (b) DEFINITIONS.—As used in this title—
> (1) The term "personal holding company" means any corporation * * * if—(A) at least 80 per centum of its gross income for the taxable year is derived from royalties, dividends, interest, annuities, and (except in the case of regular dealers in stock or securities) gains from the sale of stock or securities * * *

### Revenue Act of 1937

The first major revision of the provisions relating to personal holding companies came in the Revenue Act of 1937, ch. 815, 50 Stat. 813. By that time, significant loopholes in the existing law had become evident.[20] One such loophole enabled corporations to shelter interest, dividends, and other such "hard-core" personal holding company income by the simple expedient of investing sufficient capital in rental property to derive 21 percent of their gross income from rents, thereby avoiding personal holding company status. This problem, as

---

[20]See the report of the Joint Committee on Tax Evasion and Avoidance quoted in part in H. Rept. 1546, 75th Cong., 1st Sess. (1937), 1939–1 C.B. (Part 2) 704.

well as the congressional solution, was discussed in the following report of the Ways and Means Committee:

> Subsection (g) [of section 353, Revenue Act of 1937] includes as personal holding company income, rents which do not constitute 50 per cent or more of the gross income. For this purpose, rents are defined as compensation, however designated, for the use of, or right to use, property. * * * Under existing law, rents are excluded from the 80 per cent classification. This was done principally so as not to interfere with bona fide and legitimate operating companies whose business consisted of the ownership and operation of office buildings, apartment houses, etc. However, your committee believes that the entire exemption of rents from this classification has permitted certain personal holding companies which are not bona fide operating companies to escape their just share of the tax burden. To prevent certain holding companies which are not bona fide operating companies from taking advantage of this exception and to protect legitimate operating companies, the proposed bill provides that rents be included in the definition of personal holding company income unless they constitute 50 per cent or more of the gross income of the corporation. This will prevent a corporation from getting out of Title IA .by investing just enough in rents to constitute the gross income therefrom, 21 per cent of the total, and still deriving the remainder of its income from dividends, interest, etc. On the other hand, it will protect the bona fide real estate corporation and other corporations renting property and deriving 50 per cent or more of their gross income from rents. *"Rents" as here used is defined in its broadest sense and includes such items as charter fees, etc., and is not limited to rent of real property.* [H. Rept. 1546, 75th Cong., 1st Sess. (1937), 1939–1 C.B. (Part 2) 704, 708. Emphasis added.]

Thus, the law (ch. 815, 50 Stat. 814–815) was amended to provide as follows:

SEC. 352. DEFINITION OF PERSONAL HOLDING COMPANY.

(a) GENERAL RULE.—For the purposes of this title and of Title I the term "personal holding company" means any corporation if—

(1) GROSS INCOME REQUIREMENT.—At least 80 per centum of its gross income for the taxable year is personal holding company income as defined in section 353 * * *

SEC. 353. PERSONAL HOLDING COMPANY INCOME.

For the purposes of this title the term "personal holding company income" means the portion of the gross income which consists of:

> *       *       *       *       *       *       *

(g) RENTS.—Rents, unless constituting 50 per centum or more of the gross income. For the purposes of this subsection the term "rents" means compensation, however designated, for the use of, or right to use, property * * *

Several conclusions can be drawn from the evolution of the

personal holding company provisions, and especially from the legislative history, through 1937. First, it is apparent that Congress recognized a qualitative difference between rents and such hard-core types of personal holding company income like interest and dividends. However, Congress included rents within personal holding company income in an effort to frustrate easy avoidance of the personal holding company tax. Second, in including "rents" within personal holding company income, Congress defined that term "in its broadest sense." H. Rept. 1546, 75th Cong., 1st Sess. (1937), 1939-1 C.B. (Part 2) 704, 708.[21] Third, desiring only to penalize holding companies and not bona fide operating companies, Congress created a "50 percent" test whereunder corporations deriving 50 percent or more of their gross income from rents were statutorily deemed to be operating companies. Although utilizing an admittedly arbitrary percentage, the 50-percent test was obviously considered sufficient for its intended task of distinguishing between operating companies and holding companies. Congress apparently preferred to employ an objective test, offering administrative ease and a high degree of certainty, rather than a subjective one focusing on "significant services" or some other murky standard.

### Revenue Act of 1964

The personal holding company provisions were again extensively amended, this time in 1964, by section 225, Revenue Act of 1964, Pub. L. 88–272, 78 Stat. 79, to read as sections 543(a)(2) and 543(b)(3) are quoted above. The amendments made the use of personal holding companies considerably less attractive. See H. Rept. 749, 88th Cong., 1st Sess. (1963), 1964-1 C.B. (Part 2), 125, 128–129, 199–209; S. Rept. 830, 88th Cong., 2d Sess. (1964), 1964-1 C.B. (Part 2) 505, 508–509, 608–619. For example, the income test was reduced from 80 to 60 percent and applied against adjusted ordinary gross income rather than gross income. Similarly, adjusted income from rents was substituted for gross rents for purposes of the 50-percent test. Moreover,

---

[21]Note also that the Committee report expressly states that " 'Rents' * * * includes such items as charter fees." Such fees can be "active" (as in a time or voyage charter where a crew is provided) or "passive" (as in a demise or bareboat charter where just the vessel is provided). G. Gilmore & C. Black, The Law of Admiralty 193–243 (2d ed. 1975). Cf. Rev. Rul. 81–197, 1981–32, I.R.B. 7.

the 10-percent test was introduced to further assure that rents could not be used to shelter any appreciable amount of other personal holding company income.

The legislative history of section 225 of the Revenue Act of 1964 confirms the three conclusions discussed above, as demonstrated by the following excerpts from the Finance Committee report:

(a) *Present law.*— * * * In general terms, a personal holding company is a closely held corporation, most of whose income is derived from certain specified forms of passive income. * * * at least 80 percent of the corporation's gross income must be from what is defined as "personal holding company income."

In general terms, personal holding company income consists of income from what are considered to be passive forms of investment. Thus, it includes dividends, interest, and annuities. * * * Rents are also classified as personal holding company income unless they represent 50 percent or more of the company's gross income. * * *

(b) *General reasons for provisions.*—Congress first imposed this tax on personal holding companies in 1934 in order to prevent the avoidance of the individual upper bracket surtax rates, by leaving what is essentially investment-type income in a corporate organization, subject to the lower corporate income tax. As indicated by the Administration, ways around the present personal holding company provisions have been found in several arrangements which permit the use of holding companies to avoid the individual income tax with respect to what is essentially investment-type income without the company involved being classified as a "personal holding company."

The principal avoidance devices involve the use of rental income, income from mineral operations, and certain capital gains which are not classified as personal holding company income as means of sheltering other investment income in such a manner that 80 percent or more of the company's gross income does not come within the technical definition of personal holding company income. In view of this, a number of modifications are made in the personal holding company provisions designed primarily to minimize the extent to which these special categories of income can be used to shelter clearly passive income. * * *

(c) *General explanation of provisions.*—The bill makes a series of modifications in the application of the personal holding company tax in the case of domestic corporations. * * * Most of the modifications * * * are designed to eliminate various means by which holding companies have been avoiding classification as personal holding companies * * *

\*       \*       \*       \*       \*       \*       \*

(c)(ii) *Decrease in 80-percent test.*—As previously indicated, one of the tests under present law provides that a company, to be a personal holding company, must derive 80 percent or more of its gross income from certain specified types of passive income, called personal holding company income.

The bill decreases this 80-percent test to 60 percent. The decrease in this percentage is made because too many holding companies which are essentially holding companies of passive income have avoided the classification as such by holding their "personal holding company income" just slightly below the 80-percent limit. The more realistic 60-percent limit together with other modifications described below will make the avoidance of this classification much more difficult for holding companies generally.

(c)(iii) *Adjusted ordinary gross income requirement.*—Under present law the 80-percent requirement referred to above is applied to the gross income of the corporation; i.e., if the gross income derived from certain passive sources equals 80 percent of the total gross income of the corporation, the corporation is classed as a personal holding company. This has made it possible for corporations to avoid personal holding company classification by seeking out types of income not characterized as passive, or of a personal holding company type, which give rise to a proportionately large amount of gross income even though leaving little, if any, income after the deductions attributable to this income. In this manner, various types of income have been used to shelter investment income and remove the company from the classification of a personal holding company. Rents, where they constitute more than 50 percent of the gross income of the corporation, are an example of a type of income used to shelter passive income, such as dividends. * * *

To overcome this problem, the bill adjusts downward the income from certain sources to the extent of certain specified deductions attributable to these types of income. Thus, the corporation will be a personal holding company if 60 percent of "adjusted" gross income consists of certain passive income. The adjustments are as follows:

1. In the case of gross income from rents, the deductions for depreciation and amortization, property taxes, interest, and rents paid to the extent attributable to the rental income received, are to be deducted from gross income.

*        *        *        *        *        *        *

In applying the 60-percent test, not only is the total gross income adjusted downward by the amount of the deductions (or interest) referred to in the cases specified above, but also in determining the rental income * * * for purposes of this test, this income also is reduced by the specified reductions.

*        *        *        *        *        *        *

(c)(v) *Rental income.*—Under present law rental income is classified as personal holding company income only if it represents less than 50 percent of total gross income. This is based on the concept that where rental income represents the major activity, the activity involved is more likely to be of an active rather than passive character. The House bill retains this 50-percent test (applying it, however, to adjusted income from rents and to adjusted ordinary gross income) but adds a second test providing that rental income may be characterized as passive, or personal holding company income even where it represents 50 percent or more of the adjusted ordinary gross income * * *

*        *        *        *        *        *        *

[The 10-percent test] gives assurance that the personal holding company

income (apart from rent) sheltered in the company may not exceed 10 percent of its ordinary gross income.

[S. Rept. 830, 88th Cong., 2d Sess. (1964), 1964–1 C.B. (Part 2) 608–611.]

The Ways and Means Committee report [22] contains essentially the same language.

The legislative history of section 225 of the Revenue Act of 1964 thus reveals Congress' continuing concern about the use of rents to shelter hard-core personal holding company income such as interest and dividends. Congress sought to alleviate this abuse not by attempting to distinguish between "active" and "passive" rents by creating a subjective "substantial services" (or similar) standard, but rather by utilizing objective criteria (the 50-percent and 10-percent tests) and employing "adjusted" income concepts. Nowhere in the legislative history is there even a suggestion that "rents" should be construed less expansively than before. That the term should continue to be construed "in its broadest sense" is supported not only by the absence of any contrary indication in either the statute or its legislative history, but also by the fact that the amendments were enacted approximately 6 years after the adoption of section 1.543–1(b)(10), Income Tax Regs.,[23] which defines "rents" using language found in section 353(g) of the Revenue Act of 1937 and in H. Rept. 1546, 75th Cong., 1st Sess. (1937), 1939–1 C.B. (Part 2) 704, 708. Also significant is the fact that the amendments were enacted at a time when other sections of the regulations[24] expressly distinguished between "active" and "passive" rentals on the basis of services rendered. As previously noted, however, Congress did not deign to adopt this distinction in the personal holding company area.[25]

---

[22]H. Rept. 749, 88th Cong., 1st Sess. (1963), 1964–1 C.B. (Part 2) 125, 199–202. For a discussion of the differences between, and the reconciliation of, the Senate bill and the House bill, see S. Rept. 830 (Part 2), 88th Cong., 2d Sess. (1964), 1964–1 C.B. (Part 2) 700, 749–756; Statement of the Managers, H.R. 8363, 88th Cong., 2d Sess. (1964), 1964–1 C.B. (Part 2) 792, 815–820.

[23]Sec. 1.543–1, Income Tax Regs., was adopted on Sept. 9, 1958, by T.D. 6308, 1958–2 C.B. 295.

[24]See note 17 *supra*. At the time that Congress was considering the Revenue Act of 1964, those regulations were numbered as follows: secs. 1.512(b)–1(c)(2), 1.1244(c)–1(g)(1)(iii), 1.1372–4(b)(5)(iv), and 1.1402(a)–1(c)(1)(iii), Income Tax Regs.

[25]The "need" for uniformity is effectively refuted in Feldman, "Active vs. Passive Rental Income: A Questionable Result Under the Proposed Regulations for Personal Holding Companies," 6 J. Corp. Tax. 316 (1980).

## Case Law Precedent

The parties have not cited any personal holding company cases involving the issue of active versus passive rents. We are aware of only one: *Webster Corp. v. Commissioner*, 25 T.C. 55 (1955), affd. per curiam 240 F.2d 164 (2d Cir. 1957).[26] In *Webster*, the corporate taxpayer actively participated in the management of its farm. However, the actual farming operations were performed by a farmer pursuant to successive 1-year contracts. Under the terms of each contract, the farmer, as operator, was required to farm in conformity with the taxpayer's master plan which programmed such matters as planting and harvesting, fertilization, and crop rotation. The farmer was also required to furnish the machinery, tools, vehicles, draught animals, and supplies necessary to properly operate the farm, as well as sufficient seed corn to plant the agreed acreage. The taxpayer, on the other hand, was required to furnish material and labor necessary for the maintenance of the farm improvements as well as one-half of the fertilizer and grass seed. The contract prohibited the farmer from operating any other farm without consent, from permitting it to be occupied by any other party for any reason, and from assigning his interest. It also expressly provided that—

this agreement is an operating agreement for the operation of the Farm by the Farmer as an independent contractor, in return for the compensations herein specified and that this agreement does not render the parties hereto partners nor give the Farmer any estate, right of possession or right to occupy or enter upon the Farm, other than the license to enter upon and occupy the Farm for the purposes and during the time contemplated by this agreement.

The farmer's compensation for operating the farm was a specified percentage of the crops to be grown and the use of the farm buildings, including the storage facilities, during the term of the contract.

The issue in *Webster* was whether the taxpayer's farm

---

[26]Respondent originally published a nonacquiescence in *Webster* in 1956–2 C.B. 11. However, it was withdrawn and an acquiescence substituted therefor in 1960–2 C.B. 7. Several years later, respondent in effect "codified" *Webster* in Rev. Rul. 67–423, 1967–2 C.B. 221.

income constituted "rent" within the meaning of section 502(g), I.R.C. 1939,[27] for purposes of the personal holding company surtax. In a Court-reviewed opinion we held that it did not. Although our opinion did not undertake to precisely define the legal relationship between the taxpayer and the farmer, it appears that it was other than lessor-lessee. Thus, we stated as follows:

An owner can receive rent in crops as well as in money, but where the owner who receives a percentage of the crop takes an active part in the operation by reserving and exercising the right of detailed supervision and direction of the operation of the farm, and the farmer is subject to all of the restrictions here present, *the farmer appears to be in some category other than that of a tenant, and the money which the petitioners received appears to be more in the nature of income from their own use of their own land than rent received by them for permitting the farmer to use their land.* Certainly some part of the amount which these petitioners received was received because of their activities in operating and supervising the farms. *The share of the crop taken by the farmers in this case, whether they be considered employees, independent contractors, joint venturers, or something else, was in the nature of payment for their services in carrying out the instructions of the petitioners * * * and the share retained by the petitioners was their return for their management and operation of the farms owned by them as well as for the use of their own land in the operations.* * * * [*Webster Corp. v. Commissioner*, 25 T.C. at 61. Emphasis added.]

See also 240 F.2d at 165 where the Second Circuit, in affirming our opinion, stated that "The problem presented arises out of an arrangement comprising many factors some of which pointed toward a landlord-and-tenant relationship and others of which pointed in other directions."

The facts in *Webster* were thus somewhat unique. Accordingly, that case is clearly distinguishable from the present one in which there was no joint enterprise between either the partnership and the tenants of Alimur Trailer Park, or Merced and the tenants of El Rancho. In both instances, the legal relationship was clearly that of lessor-lessee, and we do not understand Merced to contend otherwise.

---

[27]SEC. 502. PERSONAL HOLDING COMPANY INCOME. [I.R.C. 1939]

(g) RENTS.— * * * the term "rents" means compensation, however designated, for the use of, or right to use, property * * * "

See also sec. 29.502–1 (10), Regs. 111, which provided that "The rents which are to be included in personal holding company income consist of compensation, however designated, including charter fees, etc., for the use of, or the right to use, real property, or any other kind of property."

In view of the foregoing, we hold that the income received by Merced from the operation of Alimur Trailer Park and El Rancho constitutes "rents" within the meaning of section 543(a)(2).

## Issue 2. Right of Occupancy

Gain from the sale of property is measured by the difference between the amount realized and the adjusted basis. Sec. 1001(a).[28] The amount realized is "the sum of any money received plus the fair market value of the property (other than money) received." Sec. 1001(b). Thus, the issue here is whether the partnership underreported its gain from the sale of Alimur Trailer Park by failing to include as part of the amount received the fair market (rental) value of the Ellers' right of occupancy.[29] If so, adjustment to the incomes of the Ellers, Modesto, and Merced would follow.[30]

The disposition of the issue turns on whether the Ellers[31] conveyed their entire fee interest in the dwelling without reservation and leased it back for a 2-year period, or whether they merely conveyed a remainder interest in it. In other words, did their possessory interest in the dwelling arise by virtue of their status as lessees, as contended by respondent, or as legal owners of a reserved term for years, as contended by petitioners? The issue is factual and the burden of proof is, of

---

[28]SEC. 1001. DETERMINATION OF AMOUNT OF AND RECOGNITION OF GAIN OR LOSS.

(a) COMPUTATION OF GAIN OR LOSS.—The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 1011 for determining gain * * *

[29]As will be recalled, the Ellers were entitled to occupy the dwelling located within the trailer park for a 2-year period after the date of sale without the payment of rent and with the cost of maintenance and utilities to be borne by the purchasers.

[30]In the Ellers' case, respondent has also determined that they received a constructive dividend by virtue of their right of occupancy equal in amount to their corporations' distributive share of the increased gain attributable to that right. Both parties appear to assume that the dividend adjustment is necessarily controlled by the right-of-occupancy adjustment. However, we question whether this is the case because both Modesto and Merced appear to have had an interest in the dwelling the use of which by the Ellers, whether pursuant to a lease or under a reserved term for years, would arguably give rise to a constructive dividend. This secondary issue is moot, however, in view of our disposition of the primary issue.

[31]For the sake of simplicity, the Ellers will be treated as the sellers.

course, on petitioners. *Welch v. Helvering*, 290 U.S. 111, 115 (1933); Rule 142(a).[32]

We have carefully examined the record and studied the authorities cited by the parties. The issue is close. However, we have concluded that petitioners have not convincingly demonstrated that the Ellers only conveyed a remainder interest.

At the outset, we note that the parties disagree over the appropriate standard by which to resolve the issue. Petitioners, citing *Kruesel v. United States*, an unreported case (D. Minn. 1963, 12 AFTR 2d 5701, 63–2 USTC par. 9714), argue that our inquiry should focus on the intent of the parties to the conveyance. On the other hand, respondent, citing *Alstores Realty Corp. v. Commissioner*, 46 T.C. 363 (1966), and *Ashlock v. Commissioner*, 18 T.C. 405 (1952), argues that the appropriate inquiry should be which party to the conveyance bore the risks and burdens of ownership during the period of the Ellers' occupancy. In resolving the underlying issue, we have considered both of these factors, as well as the form of the transaction. In our opinion, each of these factors favors respondent. Accordingly, we do not find it necessary to choose which is preeminent.

*Form*

The deed from the Ellers to the purchasers is absolute on its face and in no way purports to convey less than their entire fee interest without reservation. The underlying contract was not introduced into evidence as an exhibit so we have no way of knowing what it may have recited.[33] None of the other documents, however, purports to reserve a term for years to the Ellers.

*Risks and Burdens*

The contract between the Ellers and the purchasers was consummated on February 14, 1973. Henceforth and throughout the period of the Ellers' occupancy, the purchasers paid

---

[32]Unless otherwise indicated, all rule references are to the Tax Court Rules of Practice and Procedure.

[33]The original contract dated Jan. 3, 1973, provides no clues because it specifically excepted the dwelling from the entire transaction.

the real estate taxes and the insurance premiums[34] on the dwelling. They also paid for the utilities consumed by the Ellers[35] and undertook responsibility for the maintenance of the grounds surrounding the dwelling as well as any exceptional maintenance of the dwelling itself. In our opinion, these factors demonstrate that it was the purchasers who bore the risks and burdens of ownership during the period of the Ellers' occupancy.

### Intent of the Parties to the Conveyance

We start with the purchasers. Their testimony would have been entitled to the greater weight because they are not interested parties in the present litigation. Petitioners did not call them as witnesses, however, and their absence is unexplained.[36] As we have noted before:

The burden of proof * * * [is] upon petitioners and we cannot assume that the testimony of a critical absentee witness would have been favorable to them. Indeed, the normal inference is that it would have been unfavorable. Cf. * * * Interstate Circuit v. United States, 306 U.S. 208, 226. [Pollack v. Commissioner, 47 T.C. 92, 108 (1966), affd. 392 F.2d 409 (5th Cir. 1968).]

Notwithstanding their absence, the purchasers' intent can be gleaned from their correspondence to the Ellers during the period immediately prior to the consummation of the contract. Thus, in their letter dated January 31, 1973, they begin by referencing the dwelling "being sold to us" and go on to agree "to permit" the Ellers "to occupy" it for their "personal use" for a 2-year period "without any cost." This language is simply incompatible with petitioners' contention that the Ellers reserved a term for years. If the Ellers had reserved such a term, it would not have been necessary, for example, to specify that their occupancy would be without cost to them.

---

[34]The insurance policy was not introduced into evidence as an exhibit so we cannot be certain who was named as the insured. From the tenor of the stipulation of facts and the parties' briefs, however, there is no reason to doubt that the purchasers were the insured.

[35]Petitioners' argument to the contrary, the fact that the purchasers may have agreed in the original contract to furnish utilities without cost is without consequence. That contract was rescinded and a new one negotiated to specifically include the dwelling. It is the allocation of the risks and burdens in the second contract which is of consequence.

[36]At the time of the sale, the purchasers resided in Oakland, Calif. The case was tried in San Francisco.

Moreover, the January letter repeatedly uses the verb "occupy" and speaks of the Ellers' ownership in the past tense. For example, the second paragraph provides as follows:

We shall maintain the grounds around the main house together with any exceptional maintenance during the two year period while you *occupy* the main house. The standard of maintenance to be substantially the same as *during your ownership.* You shall *occupy* the house free from interference from us or our agents or employees except as reasonably necessary to perform maintenance and repairs. You and your family shall be entitled to the same privacy as *when you were the owner* of the home. You and your family shall have and enjoy the same privileges and use of the facilities in the park on the same basis as any and all of the tenants of the park without cost to you. [Emphasis added.]

Again, we think that this language contemplates a sale and leaseback.

Finally, the various terms defining the Ellers' rights during the period of their occupancy are indicative of a lease. For example, they were not required to pay for utilities and were relieved of any responsibility for maintenance of the grounds and exceptional maintenance of the dwelling itself. Moreover, they were entitled to occupy the dwelling "free from interference" by the purchasers (except as reasonably necessary to perform maintenance and repairs) and to enjoy the same measure of privacy as during their ownership. Petitioners' arguments to the contrary, the fact that California law may imply certain of these terms in any lease does not mean that the Ellers and the purchasers intended to create some other relationship. It is not at all unusual for parties to a transaction to expressly state their rights and obligations notwithstanding covenants implied by law.

Also of consequence is the letter dated February 12, 1973, from the purchasers' attorney to the Ellers. This letter refers to a prior letter[37] regarding the Ellers' lease of the dwelling in which it was agreed that "there would be *no subletting* of the premises, and that upon your vacating of the premises during the twenty-four month period, your *tenancy* would lapse." (Emphasis added.) The letter goes on to provide that the dwelling is "sold to the buyer." In our opinion, this language is incompatible with petitioners' contentions.

---

[37]Unfortunately, the prior letter was not introduced into evidence as an exhibit.

Insofar as the Ellers are concerned, their intent is less easily discerned. They did expressly evidence their understanding of the provisions of the attorney's February letter by executing it as requested. There is nothing in the record to suggest that they took issue with any of the provisions of the purchasers' January letter. There is also nothing in the record to suggest that they allocated their basis (actuarially or otherwise) in determining the amount of gain from the sale.[38]

Petitioners contend that negotiations for the sale of the house were premised on two facts. First, because the Ellers were settled and did not have alternative housing, they were not willing to immediately surrender possession of the dwelling. Second, the dwelling did not have any immediate utility to the purchasers.[39] While there is support in the record for both statements, we do not think that they are particularly relevant to our inquiry. The Ellers were concerned only about possession. There is nothing in the record to suggest that it was important to them that their right to possession be based on a reserved term for years rather than a lease. Similarly, there is nothing in the record to suggest that the purchasers preferred to acquire the dwelling by remainder rather than in fee subject to leaseback.[40]

Petitioners rely heavily on *Kruesel v. United States*, an unreported case (D. Minn. 1963, 12 AFTR 2d 5701, 63–2 USTC par. 9714). That case, however, is clearly distinguishable. In *Kruesel*, the taxpayers owned certain farm property in fee. They sold the property to a third party but remained on it pursuant to a rent-free right of occupancy for their respective lives plus 6 months. The question there, as here, was whether the taxpayers received property in the form of the right of occupancy or whether they only sold a remainder interest. The

---

[38]If the Ellers sold their entire fee interest without reservation, no allocation would, of course, be necessary. However, if they only sold a remainder interest and retained a term for years, their basis would have to be allocated. Sec. 1.61–6(a), Income Tax Regs.; *Hunter v. Commissioner*, 44 T.C. 109, 115 (1965); Rev. Rul. 77–413, 1977–2 C.B. 298.

[39]Interestingly enough, however, the purchasers rented the dwelling to another party after the Ellers vacated in February 1975.

[40]Keeping in mind the primary reason for the renegotiation of the original contract, query whether the local zoning ordinance would have permitted the dwelling to be severed from the commercially zoned parcel even for a term for years.

court held for the taxpayers, determining that they had retained an interest in the property:

the whole contract indicates that the reservation of an interest in the selling party was *an intention of both parties to the contract*. This conclusion is firmly supported by the testimony of one of the taxpayers, the taxpayers' attorney, who negotiated for them, and the attorney who negotiated for [the third party]. [*Kruesel v. United States*, 12 AFTR 2d at 5704, 63–2 USTC par. 9714, at 89,847. Fn. ref. omitted; emphasis added.]

Here, however, the intent of the parties to the conveyance was to the contrary. *Kruesel*, therefore, affords petitioners no relief.

Petitioners also rely on the District Court's opinion in *Crosby v. United States*, an unreported case (S.D. Miss. 1973, 31 AFTR 2d 73–1191, 73–1 USTC par. 9399), affd. in part and vacated and remanded in part 496 F.2d 1384 (5th Cir. 1974). There, the taxpayers purportedly conveyed their residence to their corporation, reserving "a life estate in themselves and in their heirs." The "deed" also precluded the corporation from selling, mortgaging, or otherwise conveying any interest in the property without first offering the property to the taxpayers or their heirs at the current book value. The corporation subsequently purchased adjoining acreage and made substantial improvements to both properties. The Government determined that the taxpayers received constructive dividends by virtue of their rent-free occupancy, but the District Court disagreed, principally because it determined that both the taxpayers and their corporation had distinct interests in the residence. On appeal, however, the Fifth Circuit held as a matter of law that the "deed" was so restrictive that the corporation received no meaningful interest and that "in practical effect ownership of the property remained in the taxpayer[s]." *Crosby v. United States*, 496 F.2d at 1389. The Court of Appeals then vacated the judgment of the District Court and remanded the case for a determination of the amount of constructive dividends. Thus, we do not understand how petitioners can find solace in *Crosby*.

In view of the foregoing, we hold that the Ellers conveyed their entire fee interest in the dwelling without reservation and leased it back for a 2-year term. Accordingly, their rent-

free right of occupancy constitutes part of the amount realized from the sale of the trailer park.[41]

## Issue 3. Children's Compensation

Compensation is deductible under section 162(a)(1)[42] only if it is (1) reasonable in amount, (2) based on services actually rendered, and (3) paid or incurred. See also sec. 1.162–7(a), Income Tax Regs. In the notices of deficiency issued to the Ellers and to Modesto, respondent disallowed part of the compensation paid to the children on the ground[43] that it was unreasonable and excessive. On brief, however, respondent argues that at least part of the amount paid to the children was not based on services actually rendered.[44]

Whether amounts paid as compensation are reasonable and represent payments purely for services are questions of fact to be resolved on the basis of all of the surrounding facts and circumstances. *Levenson & Klein, Inc. v. Commissioner*, 67 T.C. 694, 711 (1977). The burden of proof is, of course, on the petitioners. *Botany Worsted Mills v. United States*, 278 U.S. 282, 289–290 (1929); Rule 142(a). The fact that payments are made to minor children by a related party does not preclude their deductibility. *Denman v. Commissioner*, 48 T.C. 439, 448–451 (1967); Rev. Rul. 72–23, 1972–1 C.B. 43.

As found above, we think that the Ellers' children performed substantial services the reasonable value of which was as follows:

---

[41]Fortunately, we are relieved from the onerous task of valuing that right because of the parties' stipulation as to its value.

[42]SEC. 162. TRADE OR BUSINESS EXPENSES.

(a) In General.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

(1) a reasonable allowance for salaries or other compensation for personal services actually rendered * * *

[43]Both notices disallowed all of the compensation paid to John Eller. It is arguable, therefore, that the ground for disallowance in his case was that the amounts paid were not based on services actually rendered.

[44]In the context of this case, the two grounds are inextricable and we find no reason to distinguish between the two. Our discussion, however, is framed in terms of "reasonableness."

| 1972 | Michael | Patti | John | Total |
|---|---|---|---|---|
| Voyage West | $550 | $550 | $400 | $1,500 |
| Golden Wheels[45] | 550 | 550 | 400 | 1,500 |
| Alimur Trailer Park | 557 | 770 | 400 | 1,727 |
| | 1,657 | 1,870 | 1,200 | 4,727 |
| 1973 | | | | |
| Golden Wheels | 1,334 | 1,334 | 934 | 3,602 |
| Alimur Trailer Park | 25 | 25 | 0 | 50 |
| | 1,359 | 1,359 | 934 | 3,652 |
| 1974 | | | | |
| Modesto | 2,528 | 2,500 | 1,800 | 6,828 |
| El Rancho[46] | 156 | 116 | 68 | 340 |
| | 2,684 | 2,616 | 1,868 | 7,168 |

Our findings differ somewhat from the amounts deducted by petitioners for two reasons. First, we think that the reasonable value of John's services must reflect the age differential between him and his brother and sister.[47] In 1972, John was 7; Michael and Patti were 12 and 11, respectively.[48] Experience teaches that 11- and 12-year old children can generally handle greater responsibility and perform greater services than 7-year old children. Moreover, Walt testified that it was his practice to promote youngsters as they demonstrated their aptitude, acquired experience, and developed greater responsibility. And as Michael testified, with greater responsibility came greater remuneration.

Second, we think that there should be some relationship between the reasonable value of the children's services over the 3-year period. After all, the record does not indicate that the children rendered significantly greater services (whether

---

[45]For purposes of the Rule 155 computation, we assume that the parties will treat these amounts as deductible in 1973, thus paralleling their treatment by the notice of deficiency issued to the Ellers. See note 7 *supra.*

[46]For purposes of the Rule 155 computation, we assume that the parties will treat these amonts as having been paid pro rata by Modesto and Merced, thus paralleling their treatment by the notice of deficiency issued to Modesto. See note 8 *supra.*

[47]There is nothing in the record to suggest that John performed a greater quantum of services than his siblings so as to neutralize the age differential.

[48]In our opinion, the age differential between Michael and Patti was inconsequential.

measured quantitatively or qualitatively) during 1974 than they did during either 1972 or 1973.

Respondent advances a number of arguments in support of his position. Suffice it to say that we have considered those arguments but have concluded from our examination of the record that most of the compensation paid was both reasonable in amount and based on services actually rendered.

To reflect both our conclusions herein and the concessions by the parties,

*Decisions will be entered under Rule 155.*